**UNITED STATES of America**

v.

**Raynard WALTON, Appellant.**

No. 93–5074.

United States Court of Appeals,
Third Circuit.

Argued Sept. 10, 1993.

Decided Dec. 8, 1993.

Brian P. Reilly (argued), Office of Federal Public Defender, Newark, NJ, for appellant.

Edna B. Axelrod, Glenn J. Moramarco (argued), Office of U.S. Atty., Newark, NJ, for appellee.

Before STAPLETON, ROTH and LEWIS, Circuit Judges.

## OPINION OF THE COURT

LEWIS, Circuit Judge.

Raynard Walton was convicted of one count of conspiracy to traffic in firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A). Key to his conviction was the government's introduction into evidence of a confession Walton gave to agents investigating him. Because one of the agents assured Walton that his statements to them would not be used against him, and in view of the totality of the circumstances surrounding his encounter with the agents, we hold that the confession should not have been admitted at trial. We further hold that the erroneous admission of the confession was not harmless. Therefore, we will reverse Walton's conviction.

## I.

On September 14, 1990, Lorenzo Toledo, an undercover agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF") in Plainfield, New Jersey, bought a Davis .380 semi-automatic pistol with a defaced serial number from Tyrone Morris, who was not licensed to deal in firearms. An ATF firearms examiner "recovered" the serial number and identified it as either AP060328 or AP060528. Two weeks prior to the date of the sale, Walton, who did have a firearms license, had purchased a Davis .380 semi-automatic with serial number AP060528.

On September 27, 1990, Toledo bought a Tokarev/Norinco 9 millimeter semi-automatic pistol with a defaced serial number from Morris. The "recovered" serial number was 308991. Three weeks prior to this sale, Walton had purchased a 9 millimeter semi-automatic pistol with serial number 308991.

On October 2, 1990, Toledo returned to Morris's home in Plainfield to purchase another firearm. Morris was talking to a man on a motorcycle, who sped away when Toledo approached. The motorcycle was registered to Walton, and Toledo later identified Walton as the man who rode it. Morris sold Toledo a Tec-9, 9-millimeter semi-assault pistol with a defaced serial number. The firearms examiner could not recover a complete serial number, succeeding only in identifying: "1 _ _ _ 33." In late August, Walton had purchased a Tec-9, 9-millimeter pistol with serial number 119553.

On October 10, 1990, Toledo purchased a Tokarev 9-millimeter semi-automatic pistol with a defaced serial number. The "recovered" serial number was either 315811 or 345811. In early September, Walton had purchased a Tokarev 9-millimeter pistol with serial number 315311.

In late November, Toledo discussed with Morris the possibility of purchasing many firearms. On the day he arranged the purchase, he was told that Morris's source for the firearms would be arriving at around 5:00 p.m. When Toledo arrived at Morris's house shortly after 5:00 p.m., another car, driven by defendant Walton, was also waiting in Morris's driveway. Toledo recognized Walton, who looked at Morris's window as if he were waiting for Morris to appear, "put up his hands ... [s]aying I guess, he's not here," and left. Morris never came downstairs to meet Toledo.

Morris was arrested in February 1991, and named Walton as his source for firearms in a written statement. He said Walton had supplied him with the firearms even though

Walton knew Morris had previously spent time in jail. He also said that Walton had offered to obtain firearms for Morris whenever needed.

Because Morris had implicated Walton, ATF conducted a regulatory inspection of Walton's home at the address listed on his firearms license. Under federal firearms regulations, licensees must permit such an inspection once a year and must provide access to required records of purchases and sales. The agents did not inform Walton that he was suspected of being Morris's source of firearms; they allowed him to believe the inspection was solely regulatory.

During the inspection, at which both Toledo and ATF agent Kent Montford were present, Walton told the agents that he had no records for them to inspect and that the only two occasions on which he had used his license to purchase firearms had been in 1986 and 1987. After being advised of and waiving his *Miranda* rights, Walton repeated these assertions in a written statement. In fact, invoices later revealed that Walton had used his license to purchase 23 firearms during the period from August through November 1990, as well as additional purchases dating back to September 1989.

The day after the inspection, Walton called Montford and stated he wanted to meet Montford and Toledo at an open area outside the local library in Plainfield to talk to the agents off the record. Walton knew Montford because they had attended school in the same school system at approximately the same time and had wrestled in the same program in high school.

Toledo, Montford and Walton met on a park bench. During the meeting, which lasted a half-hour to 40 minutes, Toledo did most of the talking. Early in the conversation, Montford told Walton, "I've known you for a long time. If you want, you can tell us what happened off the cuff." Montford also told Walton he could leave at any time and did not have to say anything until he spoke to an attorney, although it is unclear when during their conversation this advice was given. Walton was not apprised of his *Miranda* rights as he had been during the regulatory search the previous day.

Five or ten minutes into the meeting, Walton admitted to Toledo and Montford that he had provided the firearms Morris sold. Walton told the agents he did not know what he should do and that he wanted Montford to help him because Montford was his friend. He told the agents he had become involved in illegal firearms trafficking because he needed money to buy a house.

One month later, the government charged Walton with conspiring with Morris to deal in firearms illegally. Before trial, Walton moved to suppress the evidence of his oral statement to Toledo and Montford. Following a suppression hearing, the district court denied his motion, even though Montford testified at the hearing that it had been his understanding and intention that the agents "weren't going to use this [the statement] against him [Walton]." At trial, Montford again discussed what had happened, saying, "I ... think as a human or person, if someone told you something and you gave him the word you weren't going to use this against him.... That is the reason why I didn't read him rights or tell him you're under arrest or contained in this area; you couldn't leave." Montford only learned that Walton's statement would be used against him when he met with the Assistant United States Attorney handling the case, who said it could be used.

In his defense, Walton testified that he had purchased the firearms for which he had failed to keep records to mail to his brother, who was stationed with the military in Panama. He was convicted and sentenced to 18 months imprisonment.

## II.

■ Decisions on motions to suppress are subject to a mixed standard of review. We may reverse the district court's findings of historical fact only if clearly erroneous, but the district court's determination of whether a statement was voluntary is subject to plenary review. *United States v. Inigo*, 925 F.2d 641, 656 (3d Cir.1991); *United States v. Fraction*, 795 F.2d 12, 14 (3d Cir.1986).

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const., amend. V. This clause has been interpreted as prohibiting the use of coerced confessions against a defendant at trial. *See generally Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

 This is not a *Miranda* case. Indeed, Walton concedes that his conversation with Toledo and Montford, taking place as it did in a public park with full freedom of movement, occurred in a noncustodial setting. *See* Walton's brief at 13. *Cf. Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *Schiro v. Clark*, 963 F.2d 962 (7th Cir.1992), *cert. granted* ——— U.S. ———, 113 S.Ct. 2330, 124 L.Ed.2d 243 (May 17, 1993) (procedural protections provided by *Miranda* attach only in cases of custodial interrogation).[1]

Instead, Walton argues that his oral statement to Montford and Toledo should have been suppressed because it was involuntary. He argues that Montford's promise not to use the conversation against him induced him to confess. The district court refused to suppress Walton's confession because it found that Walton made the statement voluntarily.

 That a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise. Despite some language in early Supreme Court cases such as *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897) (indicating that a confession cannot be obtained by " 'any direct or implied promises, however slight, nor by the exertion of any improper influence' "), it is clear that the voluntariness of a confession does not depend solely upon whether it was made in response to promises. Instead, we must determine voluntariness by judging the totality of the circumstances. *See Arizona v. Fulminante*, 499 U.S. 279, 284–85, 111 S.Ct. 1246, 1251, 113 L.Ed.2d 302 (1991)[2] (noting that the above-quoted passage of *Bram*, "which under current precedent does not state the standard for determining the voluntariness of a confession," was itself part of a totality of the circumstances test). *See also Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir.1986). "The question in each case is whether the defendant's will was overborne when he confessed." *Id.* The burden is on the government to establish, by a preponderance of the evidence, that a challenged confession was voluntary. *Id.*

### A.

Examining the totality of the circumstances in this case requires us first to determine whether Montford's statement to Walton that Walton could tell the agents what had happened "off the cuff" induced Walton's confession because it led him to believe that whatever he said would not be used against him. *Cf. Miller*, 796 F.2d at 609 n. 10 (indicating that the key issue is "whether, under the totality of the circumstances, the state-

---

1. The government does not seriously argue that the conversation in the park did not constitute "interrogation." *See generally* government's brief at 15 & n. 2 (discussing "noncustodial interrogation"). We believe it self-evident that an assurance to a suspect that an agent has known him "for a long time" and that if he desires, he "can tell us what happened off the cuff" is the functional equivalent of questioning. *Cf. Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980) ("interrogation" encompasses both express questioning and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect") (footnotes omitted).

2. This citation to *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), is to the opinion of Justice White, which, as to this proposition, represented the opinion of the Court. Justice White wrote the opinion of the Court as to all portions of *Fulminante* except the Court's decision that a harmless error analysis could apply to the erroneous admission of involuntary confessions. As to that proposition Justice White's opinion represents a dissent; Justice Rehnquist wrote the opinion of the Court. Unless otherwise noted, references to *Fulminante* throughout this opinion will be to passages representing the opinion of the Court, regardless of which justice authored the particular passage cited.

ment induced the confession, not whether it was, on its face, a promise"). The government argues that it did not.

■ To decide this issue, we must examine the statement from Walton's viewpoint. *See United States v. Shears,* 762 F.2d 397, 402 (4th Cir.1985), *quoted in Miller,* 796 F.2d at 608. The court in *Shears* indicated that the appropriate inquiry is whether the defendant reasonably perceived the alleged promise as he asserts. *Shears,* 762 F.2d at 402 n. 5. In *Miller,* however, we intimated that we would examine the record for evidence of whether a defendant actually believed that the agent in question intended the promise as alleged. *Cf. Miller,* 796 F.2d at 613 (if the defendant "had made remarks that indicated that he truly believed that the state would treat him leniently ... we might not find the confession voluntary").

We reject the government's argument that Walton might have believed Montford was using the term "off the cuff" in the journalistic or "traditional criminal" sense of speaking without attribution. *See* government's brief at 17–18. The government has offered nothing more than speculation to support this argument. Walton had no prior criminal background and thus had no reason to be familiar with the "traditional criminal" usage of the term "off the cuff," even assuming that that phrase carries the connotations alleged by the government when used among hardened criminals.

Similarly, Walton gave no indication that he believed the phrase to have the "without attribution" meaning that the government urges upon us through a journalistic analogy. Both Montford and Toledo, the only other participants in the conversation, testified that they believed that the statements would not be used against Walton, as Montford had advised Walton when saying the conversation would be "off the cuff." The district court did not make a finding regarding the crucial issue of whether Walton believed Montford's

promise.[3] Nothing in the record would support a finding that Walton (either actually or reasonably) disbelieved Montford. Montford and Toledo thought that they were telling the truth in apprising Walton that what he told them would be "off the cuff." We do not see how Walton could have believed otherwise.

## B.

If Montford told Walton his statement would not be used against him, we must consider the coercive effect that such a statement, in light of all the other circumstances in this case, would have had on Walton. As noted previously, the Supreme Court's earlier indication in *Bram* that promises made by law enforcement officials render confessions inadmissible

> has not been interpreted as a *per se* proscription against promises made during interrogation.... Rather, the Court [has] indicated that it does not matter that the accused confessed because of the promise, so long as the promise did not overbear his will.... Apparently, the words "obtained by ... promises" in the *Bram* test have been read to mean "obtained because the suspect's will was overborne by ... promises." In other words, promises do not trigger an analysis different from the totality of the circumstances test.

*Miller,* 796 F.2d at 608. *See, e.g., Fraction,* 795 F.2d at 14 (citing cases holding that promises to bring cooperation to the attention of authorities do not suffice to render confession involuntary); *United States v. Robinson,* 698 F.2d 448, 455 (D.C.Cir.1983) (promises to inform the prosecutor of cooperation and to delay arresting the defendant do not render confession involuntary).

■ Therefore, the real issue is not whether a promise was made, but whether there was a causal connection between Montford's assurance and Walton's statement. *See Fraction,* 795 F.2d at 15. Causation in this sense is not "but for" causation, for "it

---

**3.** The district court found that "the defendant was seeking out the government for whatever reason" and inferred "that [Walton] sought to seek out his friend Montford to try to either importune him or to suggest to him as his friend that he do something to quash or get rid of the charges." Appendix ("app.") at 43–44. *See also* app. at 46. A finding as to Walton's intention in requesting the meeting does not indicate what he did or did not believe after hearing Montford's assurance.

can almost always be said that the interrogation caused the confession," but requires an inquiry into "whether [the agent's] statements were so manipulative or coercive that they deprived [the defendant] of his ability to make an unconstrained, autonomous decision to confess." *Miller,* 796 F.2d at 605. Again, the focus of our inquiry is on the totality of the circumstances, not solely on Montford's promise that Walton's statements would be "off the cuff." But this does not diminish the significance of the promise itself; given the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances. *See Shears,* 762 F.2d at 401–4 ("[T]here are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception ·of what the government agents have promised is an important factor in determining voluntariness.").

 The totality of the circumstances in this case points toward coercion. In *Miller,* we recognized that:

> Excessive friendliness on the part of an interrogator can be deceptive. In some instances, in combination with other tactics, it might create an atmosphere in which a suspect forgets that his questioner is in an adversarial role, and thereby prompt admissions that the suspect would ordinarily make only to a friend, not to the police.

*Miller,* 796 F.2d at 607. *Cf. Miranda,* 384 U.S. at 469, 86 S.Ct. at 1625 (one rationale for advising suspects that anything they say can and will be used against them is "to make the individual more acutely aware that he is faced with a phase of the adversary system—that he is not in the presence of persons acting solely in his interest").

We find it significant that Montford made reference to his prior relationship with Walton as a basis for inviting Walton to speak to the agents "off the cuff." It seems clear that the purpose of such a reference was to pro-vide further assurance to Walton that he could confide in the agents and that what he might tell them would not be used against him. This was borne out by Montford's own testimony that he had given Walton his "word [that the agents] weren't going to use this against him." The setting of the meeting did not detract from such a friendly assurance. Walton and the agents spoke while sitting on a park bench rather than in an environment more typically associated with a police interrogation.

Most important, however, is that in arranging the "off the record" discussion with Montford, Walton had no reason to believe that he was the subject of a criminal investigation; he knew only that he had been the subject of a regulatory inspection. The previous day, the agents had deliberately withheld from Walton that he was suspected of providing firearms to Morris. Instead they led him to believe that the sole purpose of the inspection was regulatory. Nothing had transpired between the search of his home and the meeting on the park bench to suggest to Walton that either incident was, in fact, focused on his possible involvement in more serious criminal violations.

Given the circumstances, there was no reason for Walton to disbelieve Montford that nothing he said would be used against him, and to rely instead upon the *Miranda* warnings he had been given the previous day. Indeed, the *Miranda* warnings of the previous day and Montford's assurances during the park bench meeting appear exclusive of, and inconsistent with, one another. A person without prior exposure to the criminal justice system, even one with Walton's intelligence and education,[4] could easily be taken in and induced to speak under these circumstances.

In *Miller,* we considered a case in which a police officer made implied promises of leniency and of obtaining psychiatric help for the defendant instead of putting him in jail. In that case, the defendant had been interrogated for 42 minutes, during which the officer who was questioning him acted in a friendly manner and made misrepresenta-

---

4. Walton had attended college.

tions. When the defendant finally confessed, he collapsed in a state of shock. We examined the totality of the circumstances and decided that the officer's tactics were not "sufficiently manipulative to overbear the will of a person with Miller's characteristics." *Miller*, 796 F.2d at 611. In the course of doing so, we implied that we would find a direct promise of leniency more coercive than the promises we were examining. *See Miller*, 796 F.2d at 609. In this case the agent went beyond a direct promise of leniency; he assured Walton in advance that his statement would not be used against him.

In *Miranda* the Supreme Court reasoned in part that a warning that statements could be used against the speaker would make a suspect aware of the consequences of foregoing the right to remain silent. "It is only through an awareness of these consequences that there can be any assurance of real understanding and intelligent exercise of that privilege." *Miranda* 384 U.S. at 469, 86 S.Ct. at 1625. In contrast here, Montford's assurances that Walton could speak "off the cuff" created a situation in which Walton was deprived of the ability to understand the consequences of foregoing his privilege. *A fortiori*, he was deprived of the ability to make an intelligent choice between exercising and waiving that privilege. Accordingly, we decline to characterize Walton's statement as voluntary.

We have located only one other federal court of appeals case involving a direct promise not to use a suspect's statement. *See United States v. Fisher*, 700 F.2d 780 (2d Cir.1983). *Fisher*, however, involved a markedly different factual setting than we have here. Investigator Kenneth Graham had traced a handgun used in a shooting to Fisher, who said he might have been the person who bought the gun and he would be willing to meet the next day. That evening, Fisher called Graham and, while taping the call, posed a series of hypotheticals implying that someone else had purchased the gun only to have it stolen, and asking whether the purchaser would be in trouble. During the conversation, Graham told Fisher that federal authorities "were not going to be advised anyway" and "anything you say is confiden-

tial. Nobody's going to find out about it or anything else. It's strictly between you and me and the four walls, you know." *Id.* at 782.

The government did not attempt to introduce Fisher's statements at Fisher's trial on firearms charges, but it did introduce evidence which it obtained when Graham followed up on what he had learned from Fisher. Fisher objected, arguing that the evidence was the fruit of the poisonous tree as it stemmed from his involuntary statements in response to Graham's promises. Both the district court and the court of appeals disagreed, finding that its discovery was inevitable under the facts of the case.

In *dicta*, the court of appeals stated:

> Fisher, analogizing his statements to Graham to a plea of guilty, argues that they were "involuntary" because the promise that led to them—Graham's promise not to inform the federal authorities—was not honored. Fisher's taping the original conversations with Graham and the reference to federal authorities do suggest that the admission was made because Graham assured Fisher that nothing would be said to federal authorities. Thus ... there is a fair ground for arguing that this unfulfilled promise is a "misrepresentation."

*Id.* at 783. The court ruled, however, that Fisher's Fifth Amendment rights had not been violated because (1) Fisher, not Graham, initiated the call; (2) Fisher was not the target of Graham's investigation and thus was not entitled to *Miranda* warnings or Fifth Amendment protections at the time of the call; and (3) any promise Graham made was based on misrepresentations Fisher had made during their conversation. *Id.* at 784–85.

This case and *Fisher* are similar in one respect: Walton, like Fisher, initiated the call to authorities to discuss matters. Otherwise, however, *Fisher* is distinguishable. First, the court in *Fisher* found that Fisher had not been the target of Graham's investigation at the time the two talked. In contrast, Walton already was the focus of the ATF inquiry, as even he knew to some ex-

tent.[5] Second, Graham made the promises to Fisher when operating under misinformation Fisher had provided him; in contrast, there is no suggestion that Walton attempted to mislead Montford and Toledo during their meeting.

We conclude that under the totality of the circumstances, Walton's confession should not have been admitted at trial.

### III.

■■■■■ The erroneous admission of the confession would not result in reversal if it was harmless. Admission of a coerced confession can be harmless error. *Fulminante,* 499 U.S. at 307–11, 111 S.Ct. at 1264–65. Because this is a constitutional error analysis, however, before the admission can be held harmless the government must prove that it was "harmless beyond a reasonable doubt." *Id.* 499 U.S. at 294–95, 111 S.Ct. at 1257. That is, the government must show that admission of the confession did not contribute to the defendant's conviction. *Id.*

■■■■ As the Supreme Court has recognized,

A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

*Id.,* (quoting *Bruton v. United States,* 391 U.S. 123, 139–40, 88 S.Ct. 1620, 1629–30, 20 L.Ed.2d 476 (1968) (White, J., dissenting)). An "involuntary confession may have a more dramatic effect on the course of a trial than do other trial errors—in particular cases it may be devastating to a defendant." *Id.* 499 U.S. at 311–12, 111 S.Ct. at 1266 (Rehnquist,

J., dissenting). Despite the government's urging to the contrary, we believe admission of the confession was not harmless in this case.

Walton was convicted of conspiracy. The "gist [of a conspiracy charge] is the agreement and specific intent to commit an unlawful act, and when required by statute, an overt act." *United States v. Wander,* 601 F.2d 1251, 1259 (3d Cir.1979) (determining the sufficiency of an indictment); *see also United States v. Feola,* 420 U.S. 671, 694, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975). In this case, Walton's confession was the only direct evidence that linked him to Morris.

Tending to support conviction were the facts that Walton was definitively linked to the gun Morris sold to Toledo on September 27; Toledo saw Walton talking to Morris on October 2; and, in November, Toledo saw Walton waiting at Morris's house at the time Morris said his source of firearms would be arriving. Further, Walton offered no explanation as to how the firearms sold to Toledo, to the extent they were traced to Walton, surfaced in New Jersey if he had sent them to his brother in Panama, as he claimed.

Additionally, of course, there is the evidence that Walton lied to ATF agents when they inspected his home. During the regulatory inspection, Walton told investigators and averred in a written statement that he had not used his license to purchase firearms since 1986 or 1987. But, as noted previously, invoices revealed that Walton purchased 23 firearms during the alleged conspiracy.

Walton was only tangentially linked to the other three of the four firearms Morris sold to Toledo, however. He was linked to a gun bearing one of two possible serial numbers on the gun Morris sold to Toledo on September 14. The jury could have tied him to the gun Morris sold to Toledo on October 2 only by choosing both to fill in the blanks in the recovered serial number with the numbers on the weapon Walton had purchased earlier and to decide that the firearms examiner had erred in recovering the next-to-last number

5. It appears from the record that Walton was advised only that the inspection the ATF agents conducted of his home was regulatory. Nevertheless, by the time he met with Montford and Toledo, Walton knew that he had misstated facts to the ATF in a written statement; therefore, he knew he might be subject to criminal sanctions, though in the regulatory context and not in connection with the firearms provided to Morris.

in the serial number sequence. Similarly, the jury would have had to decide that the firearms examiner had generally recovered numbers satisfactorily but had erred in recovering one number on the gun Morris sold to Toledo on October 10.

At trial, Walton testified that he was in Morris's driveway on October 2 because he was leaving a friend's house nearby through Morris's driveway. He denied that he was at Morris's house in November, when Toledo allegedly saw him.

Given the loose circumstantial link between Walton and three of the four firearms Morris sold and the relatively scant evidence of a connection between Walton and Morris otherwise,[6] and remembering that the essence of a conspiracy charge is an agreement between co-conspirators, we cannot say that admission of Walton's confession "did not contribute to" his conviction. *Cf. Fulminante,* 499 U.S. at 294–95, 111 S.Ct. at 1257.

■ The government argues that the weight a confession may carry is diluted to some extent in this case by the fact that neither Toledo nor Montford created a record of Walton's statement, either in a formal written report, in rough notes or by voice recording. The defense therefore had the opportunity, and did attempt, to impeach the agents' testimony on whether the conversation occurred. Supplemental appendix at 84–85, 102–05, 125–28. The Sixth Amendment provides Walton with the right to confront the witnesses against him, U.S. Const., amend. VI, and his opportunity to cross-examine the agents satisfied an important element of that right. *E.g., Kentucky v. Stincer,* 482 U.S. 730, 736, 107 S.Ct. 2658, 2662, 96 L.Ed.2d 631 (1987) ("a primary interest secured by [the Confrontation Clause] is the right of cross-examination"). Of course, that is not our concern here. The satisfaction of Walton's rights under the confrontation clause does not make up for, or render harmless, the violation of his Fifth Amendment right not to be compelled to incriminate himself. Therefore, the government may not use involuntary incriminating statements to support a conviction merely because the statements are subject to impeachment.

In arguing that the admission of Walton's statement was harmless, the government also relies on the fact that both Toledo and Montford told the jury they had not expected the confession to be used against Walton. This testimony, however, does not convince us that the jury did not credit the confession and use it against Walton.

■ Finally, the government argues that the erroneous admission of the confession during Montford's and Toledo's direct examinations was harmless because the confession would have been admissible on cross-examination. During his direct testimony, Walton denied that the conversation with Montford and Toledo took place. The government contends that, under *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975), it could then have referred to his confession to impeach him even if it had been precluded from introducing it into evidence on direct.

The Court in *Hass* did not rule that an involuntary confession could be used for impeachment purposes. It noted that there was no evidence indicating that the statements used for impeachment purposes in that case had been coerced or made involuntarily. *Id.* at 722, 95 S.Ct. at 1221. Contrary to the government's broad reading of *Hass,* that case merely stands for the proposition that evidence obtained in violation of *Miranda*'s prophylactic measures, although inadmissible as direct evidence of guilt, can be used for impeachment. In this case, we have construed Walton's confession to be of a different character: it was involuntary. As such, it could not have been used to impeach him at trial. *New Jersey v. Portash,* 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979) (compelled incriminating statement inadmissible for impeachment purposes); *see generally Michigan v. Harvey,* 494 U.S. 344, 350–51, 110 S.Ct. 1176, 1180–81, 108 L.Ed.2d 293 (1990) (distinguishing between use of evidence obtained in violation of prophylactic

---

6. The record does not indicate that Morris testified at Walton's trial, or that his statement implicating Walton was introduced.

measures and evidence obtained involuntarily).

We find it significant that from our review of the record it appears Morris did not testify at trial. Nor was his statement implicating Walton introduced into evidence. The jury was not told that ATF agents had inspected Walton's house because Morris had implicated him as his source; they were told that it was a regulatory inspection. Arguably, the jury could have inferred a connection between the two from Morris's having sold at least one firearm Walton had purchased; from the instance in which Toledo saw Walton talking to Morris; and from Toledo's observation of Walton at Morris's house when Morris's supplier was supposed to show up.

Even with the reasonable inferences that may (or may not) have been drawn from this evidence, however, inasmuch as the government had to prove beyond a reasonable doubt that an agreement between Morris and Walton existed, we cannot imagine that Walton's confession was of no moment. Were this other than a constitutional error, we might conclude otherwise. Here, however, the government's burden was to establish, beyond a reasonable doubt, that the admission of Walton's confession did not contribute to his conviction. *Cf. Fulminante,* 499 U.S. at 294–95, 111 S.Ct. at 1257. Given the circumstantial nature of the government's admissible evidence of conspiracy, and the powerful impact of a confession, we cannot say that admission of Walton's confession did not contribute to Walton's conviction.[7]

### IV.

In light of the foregoing, because Walton's statement was involuntary and its introduction into evidence was not harmless error, we will reverse Walton's conviction.

7. Walton also argues on appeal that the district court erred in refusing to admit one of his exhibits; in conducting the trial in a manner which allegedly revealed bias; and in increasing his offense level by six because it found that he had purchased 64 firearms to supply to Morris during the course of the conspiracy. Given our ruling for Walton on the suppression issue, we need not address these additional arguments.