OPINION
 

 FARNAN, District Judge.
 

 Presently before the Court is Defendant Josette Jacobs’s (“Defendant”) Amended Motion to Suppress Evidence. (D.I.61.) For the reasons set forth below, the Motion will be granted.
 

 I. NATURE AND STAGE OF THE PROCEEDINGS
 

 Defendant has been charged with knowingly conspiring to possess with the intent to distribute more than five (5) kilograms of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. (D.I. 2.) Defendant moves pursuant to Federal Rule of Criminal Procedure 12(b)(3) and the Fourth and Fourteenth Amendments of the United States Constitution to suppress statements made by her on March 14, 2000, and April 4, 2000.
 

 On January 24, 2002, the Court granted the motions of Defendant for new counsel to be appointed. Defendant filed her initial motion to suppress on April 22, 2002, alleging that the statement made by her on April 4, 2000, should be suppressed because it was taken in violation of
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court commenced a hearing on that issue on May 24, 2002. At that time, the government presented the testimony of Detective and FBI Special Federal Officer (“SFO”) Liam Sullivan to answer the original motion’s claim that Defendant was in custody on April 4, 2000, and that
 
 Miranda
 
 warnings should have been provided. During SFO Sullivan’s cross-examination, the Court adjourned the hearing and directed the government to provide additional discovery materials relating to FBI protocols for dealing with a confidential informant who is alleged to have participated in unauthorized criminal activity. The government provided this additional discovery in June of 2002.
 

 On December 30, 2002, the Defendant filed an amended motion to suppress, seeking to suppress a statement that she made to law enforcement on March 14, 2000, in addition to the statement that she made on April 4, 2000. On January 10, 2003, the Court held a hearing on Defendant’s amended motion to suppress and a supplemental hearing at Defendant’s request on July 25, 2003.
 

 II. FINDINGS OF FACT
 

 1. SFO Sullivan has worked for the Wilmington Police Department for approximately twenty years. (Tr. at 6.) He worked in the “drug unit” of the Wilmington Police Department for four years, and was a patrol officer for one year. (Tr. at
 
 *DCLXIV
 
 7,100.) SFO Sullivan joined the Federal Task Force in October 1993. (Tr. at 100.) As a member of the Task Force, he is assigned to work with federal agents on various cases. (Tr. at 6.)
 

 2. SFO Sullivan’s responsibilities with the FBI Task Force are twofold: 1) to investigate and apprehend violent fugitives who flee the state of Delaware; and 2) to investigate narcotics violations as they relate to organized groups or gangs.
 

 3. SFO Sullivan has known the Defendant for approximately ten years. (Tr. at 9.) He became acquainted with the Defendant when he was making the transition from the drug unit to the patrol unit of the Wilmington Police Department. (Tr. at 100.) The Defendant was an information source for SFO Sullivan.
 
 [1]
 

 4. During the time that SFO Sullivan was in the patrol unit, Defendant provided him with information concerning drug sales, street activity, and events relating to drug investigations in the Riverside Projects. (Tr. at 99.) Although this contact between SFO Sullivan and the Defendant was undocumented and informal, SFO Sullivan testified that the information that the Defendant provided during this time was “good,” although he does not now have a specific recollection of the information or if arrests were made. (Tr. at 99.)
 

 5. When SFO Sullivan joined the FBI Task Force, he worked to develop the Defendant as a paid informant. (Tr. at 101.) Specifically, SFO Sullivan told Defendant that he was affiliated with the FBI, and that the FBI would pay more than the Wilmington Police for information. He also told Defendant that if she wanted to work for the FBI Task Force she should contact him. (Tr. at 101.) Subsequently, the Defendant became an informant for the FBI Task Force.
 

 6. SFO Sullivan was the Defendant’s “case-handler.” (Tr. at 10.) As her case-handler, SFO Sullivan would be contacted first if Defendant had information. (Tr. at 10.) If SFO Sullivan was not available, a co-case agent would be notified. (Tr. at 10.)
 

 7. SFO Sullivan, and an FBI Special Agent were jointly responsible for any payments made to the Defendant for information. (Tr. at 10.) However, it was the Special Agent’s responsibility to process the paperwork associated with payments made to the Defendant. (Tr. at 10.)
 

 8. The information that the Defendant provided to the Task Force included information about: 1) fugitives; 2) top level drug dealers in the City of Wilmington; and 3) current criminal trends.
 

 9. SFO Sullivan characterized the Defendant as a “good” informant whose “information” was reliable. (Tr. at 11.)
 

 10. There was no set scheduled contact between the Defendant and SFO Sullivan. SFO Sullivan characterized their contact as follows:
 

 there was no set schedule for her to contact us or for us to contact her. I think the safest way to describe it would be that if she heard or obtained information that she regarded as pertinent to some criminal activity, she would contact us, or if we had a question about an individual or individuals that we were interested in, and we thought she might have knowledge, or could assist, then we would reach out for her.
 

 
 *DCLXV
 
 (Tr. at 11.) SFO Sullivan further testified that when there was a specific case that the Task Force was working on, his meetings with the Defendant were daily. However, if there was no specific case, their meetings were more sporadic. (Tr. at 102.)
 

 11. SFO Sullivan testified that the Defendant was an “outstanding source of information.” In fact, SFO Sullivan assisted the Defendant by talking to law enforcement and courts on her behalf on several occasions when the Defendant had criminal charges pending against her. (Tr. at 102-103.)
 
 [2]
 

 12. The FBI Task Force maintained a source file on the Defendant during the time that she was a paid informant. SFO Sullivan testified that source files are usually opened and closed throughout an informant’s tenure. (Tr. at 17.) In cases where an informant is not providing information actively, their files are usually closed. The Defendant was an informant for the FBI Task Force for approximately eight years and her last source file was reopened on December 7, 1998. (Tr. at 17, Government Exhibit 1A.)
 

 13. The file contained documentation of contacts between the Defendant and the FBI Task Force. However, SFO Sullivan testified that the file did not contain each and every contact between the Defendant and the Task Force. SFO Sullivan testified that the contents not documented in Defendant’s file were most likely situations where Defendant’s information was not useful to the Task Force. (Tr. at 101.) For instance, SFO Sullivan explained that
 

 if he received information that was “below the FBI norms” from the Defendant he would relay the information to other law enforcement agencies, expecting that they would contact him if an arrest was made and he would document it. (Tr. at 101.)
 

 14. The source file also documented all payments that the Defendant received for the information she provided. The source file indicates that the Defendant was paid on at least five separate occasions for information she provided, including: 1) $1,000 on January 14, 2000 (Tr. at 63; Defense Exhibit 1 at JJ0129); 2) $150 on September 23, 1999 (Tr. at 64; Defense Exhibit 1 at JJ0140); 3) $2,000 on September 30, 1999 (Tr. at 64-65; Defense Exhibit 1 at JJ0138); 4) $150 on August 3, 1999 (Tr. at 65; Defense Exhibit 1 at JJ0145); and 5) $150 in August of 1997. (Defense Exhibit 1 at JJ0180.)
 

 15. SFO Sullivan testified that FBI policy requires agents to regularly admonish informants regarding unauthorized criminal activity. (Tr. at 20.) The admonishments instruct informants not to engage in any unlawful acts except as specifically authorized. (Defense Exhibit 1 at JJ0152.) The admonishments also instruct informants to provide truthful information at all times. (Defense Exhibit 1 at JJ0152.) As a general practice, such admonishments are to be given at intervals between one hundred and twenty and one hundred and eighty days. (Tr. at 112.) Defendant’s source file indicates that she was given admonishments on December 29, 1997, January 5, 1999, and February 17, 1999.
 
 *DCLXVI
 
 (Defense Exhibit 1 at JJ0152, JJ0157, JJ0169.)
 

 16. In July of 1997, the FBI Task Force generated a Memorandum authorizing Defendant to participate in ordinary criminal activity. (Tr. at 74; Defense Exhibit 1 at JJ0190.) Specifically, the Memorandum stated that:
 

 [s]ource will be present during drug transactions involving captioned subjects and others yet unknown...
 

 Based upon my review of the facts available, captioned CW is authorized to participate in ordinary criminal activity, namely drug purchases, in as much as his/her participation is necessary to obtain information and evidence for prose-cutive purposes and to maintain his/her credibility with persons under investigation.
 

 (Tr. at 75; Defense Exhibit 1 at JJ0190, JJ0192.)
 

 17. On October 9, 1997, the FBI Task Force generated a Memorandum renewing Defendants’ authorization to participate in ordinary criminal activity. (Defense Exhibit 1 at JJ0177.)
 

 18. On January 9, 1998, the FBI Task Force generated a Memorandum authorizing Defendant to participate in ordinary criminal activity from January 11, 1998, through April 11, 1998. The specific description of authorized activity stated that Defendant could “[associate and be around captioned group of individuals during their illegal activities so that source can provide intelligence to FBI.” (Defense Exhibit 1 at JJ0167.)
 

 19. On February 24, 1999, the FBI Task Force generated a Memorandum for Defendant which authorized ordinary criminal activity from February 27, 1999, to May 27, 1999. (Defense Exhibit 1 at JJ0155.) Specifically, the Memorandum, in the description of authorized activity, stated that Defendant can “be around subjects during their drug activities to provide intelligence for the FBI.” (Defense Exhibit 1 at JJ0155.) SFO Sullivan testified that Defendant was permitted to travel to New York City and bring back a quantity of cocaine via AMTRAK to the Philadelphia train station. (Tr. at 68-69.) The cocaine was to be turned over to targeted individuals at that point and an immediate arrest made; however, the surveillance vehicles were compromised and no arrests were made. (Tr. at 69.)
 

 20. On March 14, 2000, the Defendant contacted SFO Sullivan by calling his cell phone at approximately 6:00 p.m. The Defendant indicated that the matter was important and that she needed to see him right away. (Tr. at 21.) She declined to meet him at the FBI office, and indicated that she wanted to meet at the hotel where she was staying. (Tr. at 21-22.)
 

 21. SFO Sullivan immediately notified Special Agent Duffy and they met at the FBI headquarters and proceeded to the Wilmington Hotel to meet the Defendant. (Tr. at 23.) They knocked on the door to the Defendant’s hotel room and she invited them in. (Tr. at 24.)
 

 22. The Defendant informed SFO Sullivan and Agent Duffy that she was going to tell them about “the biggest” drug dealer in Wilmington. (Tr. at 24.) She also told them that she was staying at the hotel because her house was broken into by some kids. (Tr. at 24.)
 

 23. Subsequently, the Defendant told Agent Duffy and SFO Sullivan that Bruce Stewart, who was known as Little Bruce, was obtaining very large quantities of cocaine from Los Angeles, California, and utilizing mules or couriers to bring it back. Defendant told them the source of the cocaine resided in Los Angeles. She then told them that the source’s nickname was D or Dennis and provided them with his
 
 *DCLXVII
 
 pager number. (Tr. at 25; Government Exhibit 3.)
 

 24. During this meeting, Defendant also informed SFO Sullivan and Agent Duffy that Bruce Stewart had several people involved in the operation including Darnell Evans, also known as, Ockinelli. She indicated that Bruce Stewart and Darnell Evans would go to Los Angeles to purchase the cocaine and that they were supplying all the cocaine in the City of Wilmington. (Tr. at 26; Government Exhibit 3.) The Defendant explained that approximately twice a week the cocaine was brought from Los Angeles to Philadelphia on ATA Airlines, with either Bruce Stewart or Darnell Evans and another individual, who was designated as a mule or courier. (Tr. at 26; Government Exhibit 3.) She told them that on each trip ten to fifteen kilograms of cocaine would be loaded into a large duffle bag suitcase and that the same type of bags would be used to transport the money from Delaware to California. (Tr. at 26-27; Government Exhibit 3.) The Defendant explained that the mule would take the same flight as Bruce Stewart or Darnell Evans but they would sit in different locations on the plane. (Tr. at 27; Government Exhibit 3.) She also indicated that rental cars were used to transport the cocaine and the money. (Tr. at 27; Government Exhibit 3.)
 

 25. After the Defendant explained the details of the drug operation, SFO Sullivan thought the Defendant had “entirely too much information” about the drug ring and asked the Defendant whether she had ever taken a trip. (Tr. at 28-29.) SFO Sullivan testified that Defendant denied ever taking a trip. SFO Sullivan told Defendant, “[l]isten if you did, just tell me, ... because if it comes out later, I can’t cover you.” (Tr. at 29.) Defendant again denied she had ever taken a trip, and SFO Sullivan and Agent Duffy left Defendant’s hotel room. (Tr. at 30.)
 

 26. After the March 14, 2000, meeting in the hotel, the FBI Task Force launched an investigation into the alleged Stewart drug ring. (Tr. at 31, 79.)
 

 27. From March 29 through March 31, 2000, another source contacted the FBI Task Force and gave information about the alleged Stewart drug ring. (Tr. at 32.) This source provided essentially the same information as the Defendant, except she provided more details and openly admitted that she had taken approximately seven trips for the drug ring. (Tr. at 33.) Additionally, the second source indicated that the Defendant had participated in three trips for the Stewart drug ring. (Tr. at 34-35.) On the last trip, the second source said that after the purchase of thirteen kilos of cocaine in Los Angeles, Bruce Stewart and the Defendant had an altercation, and the second source, per orders of Bruce Stewart, brought back the cocaine alone. (Tr. at 35.)
 

 28. On April 3, 2000, Bruce Stewart and two female couriers were arrested at the Philadelphia Airport. (Tr. at 35.) Also, on April 3, 2000, the Defendant was closed as an informant. The reason given for her being closed as an informant was that she was unproductive. (Tr. at 37.)
 

 29. On April 4, 2000, at approximately 5:00 p.m., SFO Sullivan contacted the Defendant and told her that he needed to see her right away. (Tr. at 38.) Shortly after she received SFO Sullivan’s call, Defendant arrived at FBI Headquarters at One Rodney Square in Wilmington with her five year old son. (Tr. at 41, 44.) She knocked on a private door to the office that is used by Task Force Officers. (Tr. at 40-41.) SFO Sullivan met the Defendant and her son at the door and directed them to the interview/processing room. (Tr. at 41.) The interview/processing room is also
 
 *DCLXVIII
 
 a detention room with a bar for securing prisoners with handcuffs. (Tr. at 42.) SFO Sullivan asked the Defendant to wait with her son in the interview/processing room. He went through another access door to the squad bay area. (Tr. at 42.) The Defendant waited in the interview/processing room for approximately thirty minutes. (Tr. at 43.)
 
 [3]
 

 30.Prior to going back to the interview/processing room, SFO Sullivan placed suitcases that were seized at the airport on April 3, 2000, on the floor of the squad bay area near his desk. (Tr. at 43.) He then went to the interview/processing room and asked the Defendant to step out, and leave her son in the room. (Tr. at 43.) The Defendant followed SFO Sullivan out to the squad bay area where an interview occurred. (Tr. at 43-44.) SFO Sullivan then advised the Defendant of the arrest at the airport of Bruce Stewart and two female mules. (Tr. at 45.) The Defendant responded by stating, “oh my [G]od.” (Government Exhibit 5; Tr. at 45.) The Defendant then noticed the suitcases on the floor of the squad bay and stated, “Oh my [G]od. [TJhats [sic] the cases. [S]ee, I told you.” (Government Exhibit 5; Tr. at 45.) SFO Sullivan then told the Defendant that he had information that she had been involved in the conspiracy to transport drugs from California to Delaware. The Defendant responded by indicating that she had just carried the money. (Government Exhibit 5; Tr. at 45-46.) SFO Sullivan further advised the Defendant that the FBI had been provided different information regarding her involvement. (Government Exhibit 5; Tr. at 45^46.) Defendant then stated, “well how else could I get any information on Bruce for you if I didn’t go.” (Government Exhibit 5; Tr. at 45-46.)
 

 31. Thereafter, the Defendant informed SFO Sullivan that she had two suitcases at her residence which she used in the trips that she made. (Government Exhibit 5; Tr. at 45^46.) When asked how many trips she had participated in without authorization from the FBI, the Defendant stated that she had made two trips and that if the Task Force had a drug dog sniff the suitcases that they would probably find traces of cocaine. (Government Exhibit 5; Tr. at 45-46.)
 

 32. SFO Sullivan then asked the Defendant if she remembered meeting SFO Sullivan and Special Agent Duffy in March and providing the initial information about Bruce Stewart, and the Defendant acknowledged that she did. (Government Exhibit 5; Tr. at 45-46.) SFO Sullivan then asked the Defendant if she remembered advising him that her house had been broken into “by kids” during that March meeting and inquired whether it was in fact “kids” that had broken into her house. (Government Exhibit 5; Tr. at 45-46.) The Defendant replied “no, BRUCE or his people did it, probably cause there was stuff in there.” (Government Exhibit 5; Tr. at 45-46.) The Defendant indicated that the “stuff’ was cocaine. (Government Exhibit 5; Tr. at 45^46.) The Defendant then Informed SFO Sullivan that she still had the suitcases at her house, but that Bruce Stewart had the keys. (Government Exhibit 5; Tr. at 46-47.)
 

 33. SFO Sullivan advised the Defendant that she should go home and think about what she wanted to do regarding further cooperation with the FBI. (Government Exhibit 5; Tr. at 47.) SFO Sullivan further indicated that the FBI would like
 
 *DCLXIX
 
 to have, the suitcases that were at her residence, and the Defendant agreed that she would turn them over the next day. (Government Exhibit 5; Tr. at 48.) At the end of this conversation, the Defendant retrieved her son from the interview/processing room and left the building. (Tr. at 48-49.)
 

 34. On April 5, 2000, the Defendant was picked up at her residence by Special Agent Duffy and other members of the Task Force. (Tr. at 51.) The Task Force was also targeting Robert Shepard, a/k/a Manny, who was located in a safe house. The Defendant indicated that she knew where the safe house was and agreed to take the Task Force to the location. (Tr. at 51.) The Defendant took the Task Force to the safe house location and gave them the two suitcases. (Tr. at 51-52.)
 

 35. The Defendant was indicted on May 8, 2001, and charged with knowingly conspiring to possess with the intent to distribute more than five (5) kilograms of a mixture or substance containing a detectable amount of cocaine in violation of 21 U.S.C. § § 841(a)(1) and 841(b)(1)(A), and 846. (D.I.2.)
 

 III. CONCLUSIONS OF LAW
 

 A.
 
 The Defendant Was In Custody During Her Questioning On April I, 2000
 

 1. The Fifth Amendment to the United States Constitution prohibits the prosecution from introducing a defendant’s statements, either inculpatory or exculpatory, resulting from a custodial interrogation, unless the prosecution advised the defendant of the procedural safeguards protecting the defendant’s right against self-incrimination.
 
 Miranda v. Arizona,
 
 384 U.S. 436, 443, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). These procedural safeguards are known as
 
 Miranda
 
 warnings.
 

 2. The key inquiry in the determination of whether an individual is in “custody” for the purposes of
 
 Miranda
 
 is “whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.”
 
 United States v. Leese,
 
 176 F.3d 740, 743 (3d Cir.1999) (inner quotations omitted). Stated another way, custody means the deprivation of an individual’s “freedom of action in any significant way.”
 
 Miranda,
 
 384 U.S. at 444, 86 S.Ct. 1602.
 

 3. A conclusion of custody is “not susceptible of an exact definition[,] ... the determination ... must be made on a case-by-case basis.”
 
 Leese,
 
 176 F.3d at 743 (citing
 
 Steigler v. Anderson,
 
 496 F.2d 793, 798 (3d Cir.1974)). Further, the determination of custody is an objective inquiry, one that evaluates the circumstances of the interrogation.
 
 Id.
 

 4. A custodial interrogation may occur outside of a police station, and, moreover, have taken place absent a formal arrest.
 
 Orozco v. Texas,
 
 394 U.S. 324, 326-27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). However, “ ‘station-house’ interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station.”
 
 Id.
 
 at 799.
 

 5. The protections of
 
 Miranda
 
 are not required merely because law enforcement officers suspect the person they are questioning of a crime. However, “[t]he more cause for believing the suspect committed the crime, the greater the tendency to bear down in interrogation and to create the kind of atmosphere of significant restraint that triggers Miranda ... But this is simply one circumstance, to be weighed with all the others.”
 
 Steigler,
 
 496 F.2d at 799-800 (citation omitted).
 

 
 *DCLXX
 
 6. Further, if undisclosed to the individual being questioned, a law enforcement officer’s subjective view that an individual he or she is questioning is a suspect does not bear upon the question of whether an individual is in custody for the purposes of Miranda.
 
 Stansbury v. California,
 
 511 U.S. 318, 324, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (citing F. Inbau, J. Reid,
 
 &
 
 J. Buckley,
 
 Criminal Interrogation and Confessions
 
 at 232, 236, 297-298 (3d ed.1986)).
 

 7. Applying the record evidence to the legal principles discussed above, the Court concludes that the Defendant was in “custody” when she was questioned on April 4, 2000. The Court concludes that an objective evaluation of the circumstances surrounding the April 4 questioning compels this determination:
 

 a. The Defendant was summoned to the Wilmington, FBI Office without explanation;
 

 b. Although the Government contends that the Defendant voluntarily came to the FBI Office in response to its request, the Defendant did so on the belief that she was an informant. However, prior to the Government’s summoning of Defendant to the Wilmington FBI Office, Special Agent Duffy had “closed” her as an informant. The Government did not notify Defendant as to this change of status prior to the April 4 questioning. Therefore, the Court concludes that the Defendant’s compliance with the Government’s summoning of Defendant is distinguishable from a situation where a suspect would feel no obligation to respond to the Government’s request;
 

 c. The Government’s subsequent questioning of Defendant was confrontational and intimidating. Specifically, SFO Sullivan advised the Defendant that she was suspected of being involved in Stewart’s drug ring. (D.I. 66 at 43-45.) Further, during his questioning, SFO Sullivan confronted the Defendant with inculpatory evidence contradicting earlier statements she made about not being involved in Stewart’s drug ring.
 
 Id.
 

 8. Evaluating the total circumstances surrounding the April 4, 2000, questioning, the Court concludes that a reasonable person in Defendant’s position would have believed that he or she was in custody for the purposes of
 
 Miranda.
 
 The Government’s communication to the Defendant that she was suspected of being involved in Stewart’s drug ring, use of interrogation tactics, and the fact that the questioning took place at the FBI Offices, suggests that the Defendant would not have believed that she could stop Agent Duffy’s and SFO Sullivan’s questioning and leave the FBI Offices during the interrogation. Therefore, the fact that the Defendant was never physically restrained and allowed to go home following the questioning does not persuade the Court that, during her questioning, the Defendant did not feel a restraint on freedom that was the equivalent of a formal arrest.
 
 See Stansbury,
 
 511 U.S. at 324, 114 S.Ct. 1526 (citing
 
 California v. Beheler,
 
 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). Thus, the Court concludes that the Government was required to advise the Defendant of her
 
 Miranda
 
 rights prior to questioning; however, it did not. Accordingly, the Court concludes that the Defendant’s statements from the April 4 questioning at the Wilmington, FBI Office are inadmissible.
 

 B.
 
 The Defendant’s Statements On March II And April I Were Involuntary
 

 1. The Fifth Amendment to the United States Constitution (the “Fifth Amendment”) provides that “[n]o person ... shall
 
 *DCLXXI
 
 be compelled in any criminal case to be a witness against himself .... ” U.S. Const, amend. V.
 

 2. An involuntary statement violates due process. U.S. Const, amend. V;
 
 Jackson v. Denno,
 
 378 U.S. 368, 376, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). The Supreme Court of the United States has recognized that noncustodial statements may be characterized as involuntary in certain circumstances.
 
 See Beckwith v. United States,
 
 425 U.S. 341, 347-48, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976) (stating, “[w]e recognize, that noncustodial interrogation might possibly... by virtue of some special circumstances, be characterized as one where ‘the behavior of... law enforcement officials was such as to overbear petitioner’s will to resist and bring about confessions not freely self-determined ....’”) (citation omitted).
 

 3. A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker.
 
 United States v. Prince,
 
 157 F.Supp.2d 316, 327 (D.Del.2001)(citing
 
 Schneckloth v. Bustamonte,
 
 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973);
 
 United States v. Swint,
 
 15 F.3d 286, 289 (3d Cir.1994);
 
 United States v. Velasquez,
 
 885 F.2d 1076, 1087 (3d Cir.1989)). Thus, if the individual’s will is overborne or his capacity for self-determination is critically impaired, the use of his confession will offend due process, and the statement will be considered involuntary.
 
 See Schneckloth,
 
 at 226-27, 93 S.Ct. 2041 (citation omitted).
 

 4. Coercive police activity is a necessary predicate to a finding of involuntariness.
 
 Colorado v. Connelly,
 
 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Further, there must be some causal connection between the police conduct and the confession.
 
 Id.
 
 at 164 n. 1, 107 S.Ct. 515.
 

 5. The emphasis of the voluntariness test is whether the police interrogation was so manipulative or coercive that the defendant was deprived of his ability to make an unconstrained, autonomous decision to speak with the police.
 
 Miller v. Fenton,
 
 796 F.2d 598, 605 (3d Cir.1986).
 

 6. The burden is on the government to establish, by a preponderance of the evidence, that a challenged statement was voluntary.
 
 See Lego v. Twomey,
 
 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972);
 
 United States v. Sunnt,
 
 15 F.3d 286, 288-89 (3d Cir.1994).
 

 7. In making a voluntariness determination, a court must evaluate all of the surrounding circumstances related to a statement.
 
 See Schneckloth,
 
 412 U.S. at 226-27, 93 S.Ct. 2041. For example, a court should look to the following:
 

 the youth of the accused; his lack of education or low intelligence; the lack of any advice to the accused of his Constitutional rights; the length of the detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as deprivation of food or sleep.
 

 Id.
 
 at 226, 93 S.Ct. 2041. Additionally, it is well established that an involuntary confession may result from psychological, as well as physical coercion.
 
 Miller v. Fenton,
 
 796 F.2d 598 (3d Cir.1986),
 
 cert. denied,
 
 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).
 

 8. A promise by law enforcement officers may qualify, under certain circumstances, as coercion.
 
 United States v. Conley,
 
 859 F.Supp. 830, 836 (W.D.Pa.1994).
 

 9. However, “[b]eeause a law enforcement officer promises something to a person suspected of a crime in exchange for
 
 *DCLXXII
 
 the person’s speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise.”
 
 United States v. Walton,
 
 10 F.3d 1024, 1028 (3d Cir.1993);
 
 see Miller v. Fenton,
 
 796 F.2d 598, 604-08 (3d Cir.1986), ce
 
 rt. denied sub nom., Miller v. Neubert,
 
 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). Rather, a promise, express or implied, is evaluated as a factor in the totality of the circumstances inquiry of whether a statement is voluntary.
 
 See Walton,
 
 10 F.3d at 1028.
 

 10. The voluntariness inquiry ultimately turns on whether the totality of the circumstances indicates that the will of the suspect was overborne by government coercion.
 
 See Colorado v. Connelly,
 
 479 U.S. 157, 169-70, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986);
 
 Walton,
 
 10 F.3d at 1028. In conducting its inquiry, the court must evaluate the events that occurred, as well as the suspect’s background and experience, including prior dealings with the criminal justice system.
 
 See Oregon v. Bradshaw,
 
 462 U.S. 1039, 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion);
 
 United States v. Cruz Jimenez,
 
 894 F.2d 1, 7-8 (1st Cir.1990);
 
 United States v. Velasquez,
 
 885 F.2d 1076, 1086 (3d Cir.1989).
 

 11. Courts in this Circuit have examined the promises of law enforcement officers in the context of a voluntariness inquiry. For example, in
 
 United States v. Conley,
 
 859 F.Supp. 830 (W.D.Pa.1994), a federal agent engaged in a series of conversations with the defendant in order to gain information about others involved in illegal activity. At the initial meeting, the federal agent told the defendant that he was willing to speak off the record and that he was not the target of the investigation.
 
 Id.
 
 at 833. Although never getting specific about what could be done for the defendant, the federal agent intimated that he was in a position to help the defendant if the defendant agreed to enter into a relationship as a cooperating witness.
 
 Id.
 
 Several weeks later, the defendant and the agent met at a hotel.
 
 Id.
 
 During this conversation at the hotel, the defendant made numerous incriminating statements.
 
 Id.
 
 at 833-35. The government later sought to use those statements in a prosecution against the defendant.
 
 Id.
 
 The district court, after examining the totality of the circumstances, determined that the statements made by the defendant were involuntary and were the product of coercion. Although the court noted that the “typical” indicators of coercion were not present, the agent’s promise to speak off the record and his friendly manner “combined to overcome Conley’s reticence about making statements to the FBI.”
 
 Id.
 
 at 837.
 

 12. In
 
 United States v. Walton,
 
 10 F.3d 1024 (3d Cir.1993), an ATF agent met with a defendant on a park bench. The defendant and the agent were high school classmates and the agent informed the defendant that the statement would be “off the cuff.” The defendant then proceeded to make several incriminating statements. The government sought to use these statements in a subsequent prosecution brought against the defendant.
 
 Id.
 
 at 1029. In conducting its analysis of the totality of the circumstances, the court emphasized that the inquiry did not rest solely on the promises made.
 
 Id.
 
 at 1029-30. However, the court pointed out that the analysis did not diminish the significance of the promise itself stating:
 

 [Gjiven the uniquely influential nature of a promise from a law enforcement official not to use a suspect’s inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of the accused’s confession in light of the totality of the circumstances.
 

 
 *DCLXXIII
 

 Id.
 
 at 1030 (citing
 
 United States v. Shears,
 
 762 F.2d 397, 402 (4th Cir.1985)). The court determined that the defendant’s statements were involuntary and noted that the defendant’s prior relationship with the agent, the agent’s comment that the conversation would be “off the cuff,” and that the defendant had no reason to believe that he was the subject of a criminal investigation, taken together, rendered the defendant’s statements involuntary.
 
 Id.
 
 at 1030.
 

 13. Based on the record evidence and the applicable law, the Court concludes that the Defendant’s statement on March 14, 2000, was involuntary. Specifically, the Court concludes that the evidence supports a conclusion of involuntariness under the totality of the circumstances:
 

 a. The ten year law enforcement officer/informant relationship between the Defendant and SFO Sullivan that produced significant and substantial information to law enforcement agencies;
 

 b. At the time she was summoned to the Wilmington FBI Office, the Defendant had no reason to believe that she was the target of a criminal investigation and subject to possible criminal prosecution;
 

 c. Although no specific promises of assistance were made, SFO Sullivan had assisted the Defendant on numerous occasions in the past in regard to her involvement in criminal matters, asking prosecutors and probation officers to be lenient on Defendant;
 

 d. The Defendant had been authorized in the past to engage in criminal activity, specifically to transport drugs and be in the presence of drug activity on more than one occasion;
 

 e. The Defendant had been specifically authorized to engage in the drug conspiracy that was the subject of the questions Defendant was subjected to by SFO Sullivan;
 

 f.Although no specific promises of payment were made, the Defendant had received payments, for the information that she provided, of approximately $3,450 from August 1997 through January 2000, two months before the statement at issue was made.
 

 14. After examining the totality of the circumstances, the Court concludes that the Government failed to meet its burden of establishing that Defendant’s statement on April 4, 2000, was voluntary. Specifically, the Court finds that the following factors establish coercion under the totality of the circumstances:
 

 a. Defendant had no reason to suspect that she was the target of a criminal investigation; she believed her conversations with the FBI to have been between an informant and officers, not police and a suspect. When Defendant left the FBI Task Force on April 4, 2000, SFO Sullivan told her she should go home and think about what she wanted to do regarding further cooperation with the FBI, and on April 5, 2000, she provided the FBI with further information, giving them the suitcases and leading them to the safe house where Robert Shepard, the target of their investigation, was located. Defendant was not advised that her statements might be used against her in a later criminal prosecution;
 

 b. The Defendant had been authorized in the past to engage in criminal activity, specifically to transport drugs and be in the presence of drug activity on more than one occasion, including the drug conspiracy for which she is now charged with participation in;
 

 c. Although no specific promises of payment were made, the Defendant had
 
 *DCLXXIV
 
 received payments, for the information that she provided, of approximately $3,450 from August 1997 through January 2000.
 

 15. The Court concludes that the above facts, taken together, establish coercion. Most importantly, the Defendant’s ten year relationship with SFO Sullivan, during which he assisted her in resolving criminal charges and the fact that she was not aware that she was a target in the instant criminal investigation and, in fact, provided helpful information in the investigation, in the Court’s view, establish, at least by implication, that whatever the Defendant said would not be used against her. Specifically, the implied promises by SFO Sullivan deprived the Defendant of the ability to make a knowing and voluntary election of whether to make a statement to the FBI Task Force. Accordingly, the Court concludes, in addition to the above determination that the Defendant’s statements were elicited in violation of
 
 Miranda,
 
 that the Defendant’s April 4, 2000, statement was the product of coercion and must be suppressed.
 

 CONCLUSION
 

 For the reasons discussed, Defendant’s Amended Motion to Suppress Statements (D.I.61) will be granted as to the statements the Defendant made on March 14, 2000 and April 4, 2000.
 

 An appropriate Order will be entered.
 

 ORDER
 

 At Wilmington, this 1st day of April, 2004, for the reasons set forth in the Opinion issued this date;
 

 IT IS HEREBY ORDERED that Defendant’s Amended Motion To Suppress Evidence (D.I.61) is
 
 GRANTED
 
 as to the statements the Defendant made on March 14, 2000, and April 4, 2000.
 

 [1]
 

 . SFO Sullivan testified about two categories of sources. One type of source provides information regarding criminal activity and is not expected to testify in court concerning the information. The other category consists of sources who purchase illegal drugs for the prosecution. (Tr. at 8.)
 

 [2]
 

 . When asked whether he had ever been involved in making some form of recommendation that charges be dropped against the Defendant, SFO Sullivan stated:
 

 Again, Mr. Tease, to be honest with you, there was more than one. The exact amount of time that I spoke with prosecutors and/or probation officers, there were several times. I know that I advised the prosecutors and/or the probation officers that, again, that she was cooperating and providing very valuable information and should be considered for some, I guess, assistance.
 

 Tr. at 76-77.
 

 [3]
 

 . The Court does not find the Defendant's testimony at the July 25, 2003, hearing about alleged threats made by SFO Sullivan to be credible. (D.I. 156 at 56-57 in Criminal Action No. 02-62 JJF.)