

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-14-2005

# USA v. Jacobs

Precedential or Non-Precedential: Precedential

Docket No. 04-2214

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Jacobs" (2005). *2005 Decisions.* Paper 22.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/22

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 04-2214

UNITED STATES OF AMERICA

Appellant

v.

JOSETTE JACOBS

On Appeal from the United States District Court
for the District of Delaware
(D.C. Criminal Action No. 01-cr-00031)
District Judge: Honorable Joseph J. Farnan, Jr.

Argued February 15, 2005

Before: SLOVITER,  AMBRO and
ALDISERT, Circuit Judges

(Filed: December 14, 2005 )

Colm F. Connolly
   United States Attorney
Keith M. Rosen (Argued)
   Assistant United States Attorney
United States Attorney's Office
Nemours Building
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE  19899
        *Counsel for Appellant*

Christopher D. Warren, Esquire (Argued)
1604 Locust Street
Philadelphia , PA  19103
        *Counsel for Appellee*

————————————

OPINION OF THE COURT

————————————

AMBRO, Circuit Judge

Josette Jacobs was indicted on May 8, 2001, and charged with conspiring to possess with the intent to distribute more than five kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Jacobs moved to suppress statements she made on March 14, 2000 ("the March statements") and on April 4, 2000 ("the April statements"). After a hearing, the District Court granted the motions. The

Government now appears.[1]  We affirm in part and reverse in part, as we hold that Jacobs' April statements were involuntary and taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), but her March statements were voluntary.

## I. Factual Background

The District Court found the following facts in its opinion reported at *United States v. Jacobs*, 312 F. Supp. 2d 619 (D. Del. 2004).

### A.    Jacobs' history as an informant.

Jacobs was a confidential informant for the Wilmington Police Department and the Federal Bureau of Investigation ("FBI") for ten years prior to March 2000.  Her primary law enforcement contact, or "case handler," was Wilmington police detective Liam Sullivan, a Special Federal Officer ("SFO") on an FBI task force.  To persuade Jacobs to become an FBI informant, Sullivan told her that he had become affiliated with the FBI and that it would pay more than the Wilmington police for information.  Jacobs provided information to the FBI about fugitives, top-level Wilmington drug dealers, and current community criminal trends.  Sullivan characterized Jacobs as a "good" informant and an "outstanding source of information." If Sullivan and Jacobs were working on a specific case they

---

[1]We have jurisdiction under 18 U.S.C. § 3731.

would meet daily, but otherwise their meetings were more sporadic.

The FBI sometimes paid Jacobs for information. From August 1997 to January 2000 she was paid five times for a total of $3,450. Sullivan also assisted Jacobs when she was charged with criminal offenses. Sullivan stated: "The exact amount of times that I spoke with prosecutors and/or probation officers, there were several times. I know that I advised prosecutors and/or probation officers that . . . she was cooperating and providing very valuable information and should be considered for some, I guess, assistance."

Jacobs was regularly admonished not to engage in any unlawful acts except as specifically authorized.[2] Between 1997 and 1999 the FBI sometimes authorized Jacobs to engage in criminal activity in order to provide intelligence for the FBI. For example, in 1999 Jacobs was authorized to travel to New York to bring back cocaine to targeted individuals in Philadelphia.

### B. The March statements.

---

[2]The Government points out that the admonishments warned Jacobs that she was subject to prosecution for any unauthorized unlawful acts. Jacobs, in turn, points out that the admonishments state that "[t]he source must abide by the instructions of the FBI."

On March 14, 2000, Jacobs called Sullivan and asked to see him right away about an "important" matter. She requested they meet at her hotel room and Sullivan agreed. Sullivan and FBI Special Agent Scott Duffey went to the hotel, knocked on Jacobs' door, and Jacobs invited them in.[3] Jacobs told them she had information about "the biggest" drug dealer in Wilmington. She said that Bruce Stewart was regularly importing cocaine from Los Angeles to Wilmington using couriers. She went on to describe the scope, members, and method of operation of Stewart's drug organization. She also described the particular suitcases used by the organization to carry the cash and cocaine. Sullivan began to suspect that Jacobs was involved in these drug offenses because she possessed "entirely too much information." Sullivan asked Jacobs if she had ever taken a trip to Los Angeles for Stewart, and Jacobs replied she had not. Sullivan then told Jacobs, "Listen[,] if you did, just tell me . . . because if it comes out later, I can't cover you." Jacobs again denied that she had traveled to Los Angeles on these drug buys, and Sullivan and Duffey then left the hotel room.[4]

---

[3]The District Court expressly found that Jacobs invited Sullivan to her hotel room on March 14. 312 F. Supp. 2d at 624. However, the Court later stated that Jacobs was "summoned to the Wilmington FBI Office" on March 14. *Id*. at 631. The former statement was correct.

[4]The District Court stated that Jacobs "had been specifically authorized to engage in the [Stewart] drug conspiracy . . . ." *Id.* at 631. However, we can find no evidence

## C.    The April statements.

After the March 14, 2000 meeting, the FBI began an investigation into the Stewart organization.   During that investigation, a different source admitted that she had taken seven trips for Stewart, and that Jacobs had, in fact, taken three trips for him.  On April 3, 2000, Stewart and two other female couriers were arrested at the Philadelphia Airport. Coincidentally, on the same day, the FBI "closed" Jacobs as an informant without informing her.

The next day (April 4), Sullivan called Jacobs and told her he needed to see her right away.[5]  Jacobs, along with her five-year-old son, then went to the Wilmington FBI office and entered through the private task force door.  Sullivan then had Jacobs and her son wait for approximately thirty minutes in a room where suspects are interviewed, processed, and detained. During this time Sullivan placed two suitcases that had been recovered during Stewart's arrest on the floor of the "squad bay area" (an open office area in the vicinity of Sullivan's desk).

of this in the record before us.

[5]Jacobs points out that Sullivan actually testified that he said that he "need[ed] to see [her] *at the office* right away." (Emphasis added.)  Further, when she tried to find out why he wanted to see her, Sullivan did not answer the question and instead said, "I will talk to you about it when you get here."

Sullivan next asked Jacobs to leave her son in the interview room and brought her out to the squad bay area, where he told her about the arrests at the airport. Jacobs then saw the suitcases and said, "That's the cases. See, I told you." Sullivan then told Jacobs that he had information that she was involved in the conspiracy to transport drugs from Los Angeles to Delaware. She responded that she had only carried money. When Sullivan said that that was not his understanding, Jacobs asked, "[W]ell, how else could I get any information on Bruce [Stewart] for you if I didn't go?" She went on to say that she had two suitcases she had used during the trips at her residence, and that a drug dog sniff of the suitcases would probably indicate traces of cocaine. Sullivan asked her how many trips to Los Angeles she had taken, and she replied there had been two. Sullivan then confronted Jacobs with other aspects of her prior statements in March that differed from what she had just told him. He next told her to go home and think about what she wanted to do regarding further cooperation with law enforcement. Further, he told her that the FBI wanted the suitcases she had at her residence.[6] It is not disputed that at no time did Sullivan (or anyone else) inform Jacobs that the FBI

_____

[6]On April 5, 2000, Duffey went to Jacobs' home and she gave him the suitcases. Also, the FBI was searching at that time for a Robert Shepard. Jacobs told Duffey that she knew the safe house where Shepard was hiding, and she took Duffey there. Jacobs still believed she was a confidential informant during this time.

had closed her as an authorized confidential informant, nor was she given any *Miranda* warnings.

## II. Standard of Review

Whether a person was "in custody" for the purposes of *Miranda*, and whether a statement was "voluntary" for the purposes of a motion to suppress, are conclusions reviewed *de novo*. *Thompson v. Keohane*, 516 U.S. 99, 112-13 (1995); *United States v. Walton*, 10 F.3d 1024, 1027 (3d Cir. 1993). However, the factual findings underlying the District Court's decision are reviewed for clear error. *Walton*, 10 F.3d at 1027.

## III. Discussion

We must determine whether Jacobs was in custody when she made her statements and whether her statements were involuntary. In section "A" we examine custody. Next, to analyze involuntariness properly, it will be useful to examine in section "B1" a preliminary issue: whether Sullivan made an implied promise that Jacobs' statements regarding the Stewart drug conspiracy would not be used against her. We will then be ready to address in sections "B2" and "B3" whether Jacobs' March statements and April statements, respectively, were involuntary.

### A.     Was Jacobs in custody during her statements?

8

Jacobs claims only that she was in custody during her April statements. Thus we address only that custody issue.

As noted, it is undisputed that Sullivan did not advise Jacobs of her *Miranda* rights before her April statements. If *Miranda* warnings are not given before a person "in custody" is questioned, evidence resulting from the questioning must be suppressed.[7] *Miranda*, 384 U.S. at 444-45. An individual is in custody when he or she has been "deprived of his [or her] freedom of action in any significant way." *Id*. at 444; *see also United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999). In *Yarborough v. Alvarado*, 541 U.S. 652 (2004), the Supreme Court gave the following description of the *Miranda* custody test:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, *would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave.* Once the scene is set and the players' lines and actions are

---

[7]However, "[s]tatements made by a defendant in circumstances violating . . . [*Miranda*] are admissible for impeachment if their trustworthiness . . . satisfies legal standards." *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978) (second omission in original) (internal quotation marks omitted).

reconstructed, the court must apply an objective test to resolve the ultimate inquiry: *was there a . . . restraint on freedom of movement of the degree associated with a formal arrest*.

*Id*. at 663 (quoting *Keohane*, 516 U.S. at 112) (emphases added) (quotation marks omitted). In this context, there are at least three differently worded tests for when a person is in custody: (1) when the person has been deprived of her or his freedom in some significant way; (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave; and (3) when there is a restraint on the person's freedom of movement of the degree associated with a formal arrest. More clear is that the determination of custody is an objective inquiry (that is, what a reasonable person would believe) based on the circumstances of the interrogation. *Leese*, 176 F.3d at 743.

The District Court correctly noted three factors that are among those that should be weighed to determine if an individual was in custody. *Jacobs*, 312 F. Supp. 2d at 627-28. One is the location of the questioning. We have stated that "all 'station house' interrogations should be scrutinized with extreme care for any taint of psychological compulsion or intimidation because such pressure is most apt to exist while a defendant is interviewed at a police station." *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974). A second factor is the information known by the officer concerning the

10

suspect's culpability. "'The more cause for believing the suspect committed the crime, the greater tendency to bear down in interrogation and create the kind of atmosphere of significant restraint that triggers *Miranda*, and vice versa.'" *Id.* at 799 (quoting *United States v. Hall*, 421 F.2d 540, 545 (2d Cir. 1969)). And a third factor is whether the officer revealed his or her belief that the suspect was guilty. *Stansbury v. California*, 511 U.S. 318, 325 (1994) ("An officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.").

The District Court applied these factors to the facts of the case and concluded that Jacobs was in custody during the April 4 interview because: (1) the questioning took place at the FBI Offices; (2) Sullivan believed Jacobs was guilty; (3) Jacobs was summoned to FBI offices without explanation; (4) Sullivan's questions were confrontational and intimidating; (5) he used interrogation tactics, including placing the incriminating suitcases in Jacobs' view[8]; (6) Sullivan communicated to Jacobs

---

[8]Sullivan acknowledged that displaying evidence to a suspect is an interrogation technique and that he placed the suitcases that were seized during Stewart's arrest near his desk because he "wanted [Jacobs] to see the suitcases in the hopes that she would come around and tell us everything that she knew." The use of interrogation techniques in a police-station setting was one of the very reasons why the Supreme Court held in *Miranda* that a suspect must be advised of his or her

11

that he thought she was guilty; and (7) Jacobs felt obligated to come to and stay at the questioning because she was reasonably under the impression that she was still an FBI informant. *Jacobs*, 312 F. Supp. 2d at 628. On appeal, Jacobs suggests two additional reasons: (8) she was not specifically told she was not under arrest before questioning began, citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (a factor indicating the defendant was not in custody was that he was specifically told he was not under arrest); *California v. Beheler*, 463 U.S. 1121, 1122 (1983) (same); and (9) she did not agree to meet with Sullivan with knowledge of the fact that questioning about a criminal offense would take place, *see United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) ("In determining whether suspects were 'in custody' for *Miranda* purposes, the Supreme Court has considered whether they voluntarily approached or accompanied law officers *understanding that questioning would ensue*." (emphasis in original)).

According to the Government, *Mathiason* suggests that Jacobs was not in custody on April 4. In that case, a police officer investigating a burglary left a note with the defendant asking him to call because the officer wanted "'to discuss something with [him].'" 429 U.S. at 493. The defendant called and a meeting was set up at the state parole office. *Id*. At the meeting, after advising the defendant that he was not under

---

constitutional rights before questioning begins. 384 U.S. at 448-55.

12

arrest, the officer told him that the police believed he had committed the burglary and (falsely) that his fingerprints were found at the scene. *Id*. A few minutes later, the defendant confessed to the crime and was sent home shortly thereafter. *Id*. at 493-94. The Supreme Court held that Mathiason had not been in custody, stating that there was "no indication that the questioning took place in a context where [Mathiason's] freedom to depart was restricted in any way." *Id.* at 495. It did so because Mathiason (1) had come to the station voluntarily, (2) was informed that he was not under arrest, and (3) left the interview without hindrance. *Id.* at 495.[9]

To suggest that *Mathiason* implies that Jacobs was not in custody reaches too far. The first factor found relevant by the Supreme Court was that Mathiason had come to the station voluntarily. In Jacobs' case, by contrast, Sullivan called Jacobs and told her that he "need[ed] to see [her] at the office right away." When Jacobs tried to find out why Sullivan wanted to see her, he did not answer the question and instead stated, "I will talk to you about it when you get here." Furthermore, Jacobs was led to believe she was still an informant and thus likely felt an obligation to follow the directions of her handler, particularly because Sullivan had paid her and used his position to influence the criminal justice system to help her previously.

---

[9]That the officer had falsely told Mathiason that his fingerprints were found at the scene was held irrelevant to the custody analysis. *Mathiason*, 429 U.S. at 495-96.

Finally, the FBI informant admonition forms stated that "the source *must* abide by the instructions of the FBI" (emphasis added). Thus, while Jacobs was not physically forced to go to the FBI offices on April 4, her decision to go cannot fairly be said to have been "voluntary" in the sense that it was for Mathiason.

In addition, Mathiason was told he was not under arrest. As Jacobs was not told anything regarding her arrest status, pro or con, this factor falls somewhat in her favor.

Another factor was that Mathiason left the interview without hindrance. Jacobs also left the interview without hindrance. However, the test for custody is not whether the police in fact let a suspect leave *at the end* of the questioning without hindrance. Rather, it is whether, under the circumstances, a reasonable person *would have believed* that *during* the questioning he or she could leave without hindrance. Thus, if this factor is useful at all, it is only an indicator of what the circumstances during the questioning would have made a reasonable person believe. Furthermore, just because an officer lets a suspect leave after he or she has gotten all the desired incriminating evidence does not mean the officer would have let the suspect leave (or, to be more precise, it does not mean the officer made the suspect believe she or he could leave) during the questioning.

Thus, the first two *Mathiason* factors cut against the

14

Government (acknowledging that the second factor favors Jacobs tepidly). The third factor (the weakest) is only marginally helpful to its case.

The Government also argues that *Beheler* suggests that Jacobs was not in custody on April 4. In *Beheler*, police were investigating a homicide arising out of an attempted robbery by Beheler and his co-conspirator, Wilbanks. 463 U.S. at 1122. After the homicide, Beheler called the police, who came to the crime scene. *Id.* He told the police that Wilbanks had killed the victim. *Id.* Later, although the police specifically told Beheler he was not under arrest, he voluntarily agreed to accompany police to the station house. *Id.* There, Beheler agreed to talk about the murder. *Id.* After less than thirty minutes, he was allowed to return home. *Id.*

The *Beheler* Court held that *Mathiason* controlled, as it "involved a factual context remarkably similar to the present case . . . ." *Id.* at 1123. However, as previously explained, the first two *Mathiason* factors cut against the Government, and only the weakest of the three factors, the third, is somewhat helpful to it. The Supreme Court also noted that "*Miranda* warnings are not required simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Id.* at 1125 (quotation omitted). That either of these two factors alone does not *per se* indicate custody hardly means that both of these factors in concert with seven other factors do not indicate custody. To recap, in

15

Jacobs' case, in addition to (1) the questioning taking place at the FBI offices, and (2) Sullivan believing Jacobs was guilty, the following additional factors were present: (3) Jacobs was summoned to FBI offices without explanation; (4) Sullivan's questions were confrontational and intimidating; (5) he used interrogation tactics, including placing the incriminating suitcases in Jacobs' view; (6) he communicated to Jacobs that he thought she was guilty; (7) Jacobs felt obligated to come to and stay at the questioning because she was reasonably under the impression that she was still an FBI informant; (8) she was not specifically told she was not under arrest before questioning began; and (9) she did not agree to meet with Sullivan with knowledge of the fact that questioning about a criminal offense would take place. None of these factors was present in *Beheler*. Thus it hardly requires us to conclude that Jacobs was not in custody on April 4.[10]

---

[10]The Government also cites *Minnesota v. Murphy*, 465 U.S. 420, 430-31 (1984), for the proposition that a suspect is not necessarily in custody when compelled to appear at a meeting with a probation officer. First, this proposition surely cannot be generalized to mean being compelled to be somewhere can never indicate custody. In fact, the very definition of being "in custody" is essentially being "compelled to be somewhere" (two of the three tests for when a person is in custody are (1) when the person has been deprived of his or her freedom in some significant way, and (2) when a reasonable person would perceive that she or he was not at liberty to terminate the interrogation and leave). Presumably *Murphy* should be limited

16

In sum, nine factors indicate that Jacobs was in custody during her April statements. The two cases on which the Government primarily relies—*Mathiason* and *Beheler*—do not support its position nearly as strongly as it argues, and in any event do not overcome our conclusion of custody. Thus we affirm the District Court on this issue.

---

to the probation context, in which the "baseline" is that the probationer will be required to attend meetings. *Cf. id.* at 432 ("[T]he nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality."). Further, unlike Jacobs' April 4 interview, a "probation interview [is] arranged by appointment at a mutually convenient time." *Id.* at 433. Finally, the two cases that the Government relies on most, *Mathiason* and *Behler*, rest largely on the fact that the suspect came to the station voluntarily (that is, he was not compelled). This implies that if a suspect is compelled to go to the station, it would be a factor in favor of custody.

The Government further argues that *Murphy* suggests that when a suspect is familiar with an interviewer and the interview situation, concluding there was custody is inappropriate. *See id.* ("Murphy's regular meetings with his probation officer should have served to familiarize him with her and her office . . . ."). But while Jacobs and Sullivan had a ten-year relationship, it was a cooperative one. While Jacobs was familiar with having conversations with Sullivan, nothing in the record shows she was familiar with Sullivan accusing her of federal offenses, asking her confrontational and intimidating questions, and using interrogation tactics on her.

17

## B. Were Jacobs' March and April statements involuntary?

Statements made to a law enforcement officer are inadmissable into evidence if the statements are "involuntary."[11] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973); *see also Colorado v. Connelly*, 479 U.S. 157, 165 (1986) (involuntary confessions violate the Due Process Clause of Fifth and Fourteenth Amendments). A statement is given voluntarily if, when viewed in the totality of the circumstances, it is the product of an essentially free and unconstrained choice by its maker. *Schneckloth*, 412 U.S. at 225; *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994). If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary. *Schneckloth*, 412 U.S. at 225-26. A suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983)

---

[11]While "[s]tatements made by a defendant in circumstances violating . . . *Miranda* . . . are admissible for impeachment if their trustworthiness . . . satisfies legal standards[,] . . . *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . ." *Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978) (emphases and third omission in original) (citations and internal quotation marks omitted).

(plurality); *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989).  A necessary predicate to a finding of involuntariness is coercive police activity.  *Connelly*, 479 U.S. at 167.  Further, there must be some causal connection between the police conduct and the confession.  *Id.* at 164.  The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary.  *Lego v. Twomey*, 404 U.S. 477, 489 (1972).  Before delving into voluntariness particular to our case, we consider first whether Sullivan misled Jacobs into believing that her statements about the Stewart drug conspiracy were not in the mix for use against her.

> **1.      Did Sullivan make an implied promise that Jacobs' statements regarding the Stewart drug conspiracy would not be used against her?**

A promise by a law enforcement officer may qualify as coercion.  *United States v. Walton*, 10 F.3d 1024, 1030 (3d Cir. 1993); *United States v. Conley*, 859 F. Supp. 830, 836 (W.D. Pa. 1994).  However, because "a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise."  *Walton*, 10 F.3d at 1028.  Rather, a promise—express or implied—is a factor (indeed, a potentially significant one) in the totality of the circumstances inquiry as to whether a statement was voluntary.  *Id.*; *Miller v. Fenton*, 796

19

F.2d 598, 608 (3d Cir. 1986).

The District Court examined *Walton* and *Conley* in considering the promises of law enforcement officers in the context of a voluntariness inquiry. *Jacobs*, 312 F. Supp. 2d at 629-31. In *Walton*, an agent of the Bureau of Alcohol, Tobacco, and Firearms met with the defendant on a park bench. 10 F.3d at 1027. The agent and the defendant were high school classmates and the agent told the defendant that his statements would be "off the cuff." *Id*. The defendant then made several incriminating statements. *Id*. The Government sought to use these statements in a subsequent prosecution against the defendant. *Id*. In analyzing the totality of the circumstances, our Court emphasized that the inquiry did not rest solely on the promises made. *Id.* at 1030. However, this did not diminish the significance of the promise itself: "[G]iven the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of the accused's confession in the light of the totality of the circumstances." *Id.* (citing *United States v. Shears*, 762 F.2d 397, 401-04 (4th Cir. 1985)). We determined that the defendant's prior relationship with the agent, his comment that the conversation would be "off the cuff," and that the defendant had no reason to believe that he was the subject of a criminal investigation, taken together, rendered the defendant's statements involuntary. *Id*.

20

In *Conley* a federal agent spoke with the defendant to gain information about others involved in illegal activity. 859 F. Supp. at 833-35. At the initial meeting, the agent told the defendant that he was willing to speak off the record and that the defendant was not the target of the investigation. *Id.* at 833. The agent also intimated that he was in a position to help the defendant if he cooperated. *Id.* Several weeks later, the defendant and the agent met at a hotel. *Id.* During that conversation the defendant made numerous incriminating statements. *Id.* at 834-35. The Government later sought to use those statements in a prosecution against him. *Id.* at 832. The Court determined that the statements were involuntary. *Id.* at 837. Although the Court noted that the "typical" indicators of coercion were not present, the agent's promise to speak off the record and his friendly manner "combined to overcome Conley's reticence about making statements to the FBI." *Id.*

After reviewing *Walton* and *Conley*, the District Court determined that Jacobs made both her March and April statements involuntarily. *Jacobs*, 312 F. Supp. 2d at 631-32. The crux of the Court's involuntariness holdings is its finding that Sullivan made an implied promise to Jacobs that her statements regarding the Stewart drug conspiracy would not be used against her.[12] *Id.* at 632. It reasoned:

---

[12]It is unclear from the District Court's opinion whether it found an implied promise as to both statements or only as to those made in April. *See* 312 F. Supp. 2d at 631-32. We need

21

Most importantly, [Jacobs'] ten year relationship with [] Sullivan, during which he assisted her in resolving criminal charges and the fact that she was not aware that she was a target in the instant criminal investigation and, in fact, provided helpful information in the investigation, in the Court's view, establish, at least by implication, that whatever [Jacobs] said would not be used against her. Specifically, the implied promises by [] Sullivan deprived [Jacobs] of the ability to make a knowing and voluntary election of whether to make a statement to the FBI Task Force.

*Id.*

The Government inveighs against this reasoning (and its inevitable conclusion) in many ways. We address each in turn.

(a) The Government begins by asserting that the District Court "conclude[d] [erroneously] . . . that an implied promise arose out of Jacobs' *status* as a police informant." (Emphasis added.) However, the Court did *not* conclude this, for nowhere

_____

not resolve this issue because, even giving Jacobs the benefit of doubt (as we do) that the Court found an implied promise as to the March statements, we conclude they were nonetheless voluntary.

22

does it say that all informants have *per se* received an implied promise not to have their statements used against them by virtue of their status as informants. Rather, it explained that the circumstances particular to this case gave rise to an implied promise.

(b) The Government next emphasizes that Jacobs was regularly admonished that she could not engage in any unlawful acts except as specifically authorized, and that she would be prosecuted if she engaged in those acts. It is true that Jacobs was on notice that she could be prosecuted for breaking laws without prior authorization, and does not argue otherwise. Rather, she argues she was not on notice that Sullivan might use her statements against her.

(c) The Government points out that Sullivan had assisted Jacobs by speaking to prosecutors and then argues that any promise could not have rendered Jacobs' statements involuntary because "[t]his court has repeatedly found . . . that even explicit law enforcement 'promises' to refer the fact of a defendant's cooperation to prosecutors do not constitute unconstitutional coercion" (citing *United States v. Fraction*, 795 F.2d 12 (3d Cir. 1986)). However, *Fraction* does not apply and the Government's argument fails because the District Court did not find a promise "to refer"; it instead found an implied promise by Sullivan not to *use* Jacobs' statements against her. Indeed, our Court has stated that "given the uniquely influential nature of a promise from a law enforcement official not to use a suspect's

23

inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of the accused's confession." *Walton*, 10 F.3d at 1030. Furthermore, those promises need not be the product of an express representation and can arise out of an understanding or custom that has developed over the years. *See Brady v. United States*, 397 U.S. 742, 743 (1970) (confession must not be "obtained by any direct or *implied promises*, however slight") (emphasis added) (internal quotation marks omitted).

(d) The next contention is that "the only possible implied promise that could have arisen in this case is that . . . Sullivan would have recommended to the relevant prosecutors that [Jacobs] not be charged in connection with the Stewart organization." It does not support this conclusory statement with any reasoning. Further, the statement is likely untrue, as Jacobs could have inferred that, if Sullivan repeatedly went out of his way to get her out of trouble, he would not then turn around and affirmatively get her into trouble by using her statements to him against her.

(e) Attack is made on the District Court's reliance that Jacobs had been paid in the past for providing information, as "at best . . . this prior history could only reasonably lead the defendant to believe that she could be paid if she provided useful information." But presumably the Court was reasoning that, because when Jacobs had provided helpful information in the past she received money (*i.e.*, was rewarded), it was

24

reasonable to anticipate the same result when she provided the helpful information about the Stewart drug conspiracy. Even if she was not to be rewarded, she would at least infer she would not be punished by having the information used against her. While past payments for information might not imply a promise to forgo use of Jacobs' current statements against her, the payments nonetheless are a valid factor supporting the existence of an implied promise.

(f) The Government tries to minimize the damage of Sullivan's "cover you" statement. To recap, near the end of the March 14 meeting Sullivan asked Jacobs if she had ever taken a trip to Los Angeles for Stewart, and Jacobs replied she had not. Sullivan then told Jacobs, "Listen[,] if you did, just tell me . . . because if it comes out later, I can't cover you." The Government is correct, of course, that this particular statement cannot retroactively make involuntary what Jacobs said beforehand in her March statements. However, it could make Jacobs think that Sullivan would "cover her" (and thus not affirmatively use her statements against her) if she gave him information at the April 4 meeting. Furthermore, the statement may indicate a general understanding between Jacobs and Sullivan that existed throughout both meetings, *i.e.*, that Sullivan would cover Jacobs (and thus not use her statements against her) as long as she let him know before "it c[a]me[] out later" in what illegal activities she was involved.

(g) Continuing its assault on the District Court's

25

conclusion of involuntariness, the Government turns to the Court's reliance on the fact that Jacobs did not know she was the target of a criminal investigation and subject to possible prosecution at the time of her statements. In *Walton*, we concluded that

> *[m]ost important* [to the finding of an implied promise not to use the defendant's statements against him] is that in arranging the "off the record" discussion with [the investigating official, the defendant] had no reason to believe that he was the subject of a criminal investigation; he knew only that he had been the subject of a regulatory inspection.

10 F.3d at 1030 (emphasis added). The Government is correct that, at the time of the March statements, the FBI had not begun an investigation and thus Jacobs was not yet a suspect.[13] Thus, the argument proceeds, Sullivan did not coercively mislead

---

[13]The District Court reasoned, in part, that on March 14 Jacobs "had no reason to believe that she was the target of a criminal investigation and subject to possible criminal prosecution . . . ." 312 F. Supp. 2d at 631. This statement implies the District Court found that Jacobs was a target of a criminal investigation on March 14. As the investigation of the Stewart organization did not begin until after March 14, Jacobs was not a target at that time.

Jacobs on March 14 into thinking she was not the subject of an investigation.

Turning to the April statements, the Government notes that Sullivan began the meeting by telling Jacobs that he believed she was involved in the conspiracy. However, this does not necessarily mean that Jacobs knew she was the *target* of a criminal investigation and subject to possible prosecution at the time of the April statements. That Jacobs continued to act as an informant rather than a suspect throughout that meeting and during the next day (when she retrieved the suitcases from her home and led Agent Duffey to the safe house) suggests that she did not know she was the target of a criminal investigation and subject to possible prosecution at the time of her April statements.

(h) Finally, the Government argues as a fallback that, assuming Sullivan did implicitly promise not to use Jacobs' statements against her, his promise did not cause her to confess. However, there is no evidence that Jacobs wanted to confess a serious crime to an FBI agent who would try to use that confession to put her in prison. Had Jacobs known Sullivan was an adversary who would use her statements to convict her—rather than believed he was an ally who would not use her statements against her—it is hard to believe she would have made the statements she did.

\* \* \* \* \*

27

All these arguments and our responses aside, we need not determine whether there was an implied promise. Instead, we conclude that Sullivan's behavior in relation to Jacobs during their ten-year relationship gave her reason to believe that he was significantly less likely than an average law enforcement official would be to use her statements against her, but more likely than if he had explicitly promised not to use her statements. Making this determination is preferable to skewing the totality of the circumstances calculus by forcing a determination of "promise" or "no promise" when the real answer is "something in between." Thus, Jacobs' decision to make the statements to Sullivan, with whom she had cooperated successfully for a decade, was significantly less "voluntary" and "knowing" than it would have been had she made it to an official with whom she has no prior relationship, and more voluntary and knowing than it would have been had Sullivan explicitly promised not to use her statements. It is sufficient that we recognize this and consider it in the totality of the circumstances inquiry of the voluntariness of the March and April statements.

## 2. Were the March statements involuntary?

The Government argues that the March 14 meeting was "the archetype of a voluntary encounter." For the most part, we agree. The voluntariness inquiry examines the totality of the circumstances surrounding statements, and most of the

circumstances of the March statements indicate voluntariness. Jacobs was the one who initiated that meeting with her phone call to Sullivan. She controlled when it took place (March 14, 2000) and where (her hotel). In addition, she chose what was discussed (the Stewart drug organization). We recognize that Sullivan's behavior in relation to Jacobs during their ten-year relationship gave her reason to believe that Sullivan was significantly less likely than an average FBI agent to use her statements against her. Yet we nevertheless conclude that Jacobs' March statements were voluntary because most of the circumstances of the March statements point to her willingness to speak by her own choice.

### 3. Were the April statements involuntary?

The April meeting presents a far different picture than the March meeting. The April statements were not offered at Jacobs' request and the meeting was neither held on her terms nor at the location of her choosing. Further, four of the same factors indicating that Jacobs was in custody on April 4 also suggest that her statements on that date were involuntary: (1) Jacobs was summoned to FBI offices without explanation; (2) Sullivan's questions were confrontational and intimidating; (3) he used interrogation tactics, including placing the incriminating suitcases in Jacobs' view; and (4) Jacobs did not agree to meet with Sullivan with knowledge of the fact that questioning about a criminal offense would take place.

29

In addition, toward the end of the March meeting, Sullivan asked Jacobs if she had ever taken a trip to Los Angeles for Stewart, and Jacobs said that she had not. As already noted, Sullivan then told Jacobs, "Listen[,] if you did, just tell me . . . because if it comes out later, I can't cover you." This statement likely made Jacobs think that Sullivan would "cover her" (and thus not affirmatively use her statements against her) if she gave him information at the April meeting.

Further, Jacobs believed her April conversation with Sullivan to have been between informant and law enforcement contact, not suspect and policeman. She was not advised that her statements might be used against her in a later criminal prosecution. When she left the FBI office, Sullivan told her she should go home and think about what she wanted to do regarding further cooperation with the FBI. On April 5, she provided the FBI with additional information, giving Duffey the suitcases and leading him to the safe house where Robert Shepard, a target of the FBI's investigation, was located. Thus Jacobs did not know she was the target of a criminal investigation and subject to possible prosecution at the time of the April statements. In *Walton*, this was the "[m]ost important" factor to our involuntariness holding. 10 F.3d at 1030.

Finally, Sullivan's behavior in relation to Jacobs during their ten-year relationship gave her reason to believe that Sullivan was significantly less likely than an average police

30

official to use her statements against her. First, he had previously authorized her to engage in criminal activity, and specifically to transport drugs. Further, he had paid her several thousand dollars for information. Because when Jacobs had provided helpful information in the past she was rewarded, it was reasonable to anticipate the same result when she provided helpful information about the Stewart drug conspiracy. Even if she was not to be rewarded, she would at least infer she would not be punished by having the information used against her. Finally, on numerous occasions Sullivan had assisted Jacobs when she engaged in unauthorized criminal activities. Jacobs could have reasonably inferred that, if Sullivan repeatedly went out of his way to get her out of trouble that she was already in, he would not then turn around and affirmatively get her into trouble by using her statements to him against her.

We thus conclude that Jacobs' April statements were involuntary.

\* \* \* \* \*

In this context, we hold that Jacobs' March statements were voluntary, but that her April statements were involuntary and taken in violation of *Miranda*. Accordingly, we will reverse the District Court's order suppressing the March statements, and we will affirm the District Court's order suppressing the April statements.

31

ALDISERT, Circuit Judge, concurring in part and dissenting in part:

I am pleased to join in the portion of the majority opinion affirming the District Court's judgment with respect to the April 4, 2000 statements ("the April 4 statements"). I must respectfully dissent, however, from the majority's opinion insofar as it concludes that the March 14, 2000 statements ("the March 14 statements") were voluntary. I do not believe that the District Court's finding that there was an implied promise not to use Jacobs' March 14 statements against her was clearly erroneous. Accepting this finding as correct, I agree with the District Court that the March 14 statements were involuntary, and accordingly should be suppressed. I would therefore affirm the District Court's judgment.

I.

In determining that Jacobs' March 14 statements were involuntary, the District Court relied on the following six factors:

> a. The ten year law enforcement officer/informant relationship between the Defendant and SFO Sullivan that produced significant and substantial information to law enforcement agencies;
> b. At the time she was summoned to the Wilmington FBI Office, the Defendant had no

32

reason to believe that she was the target of a criminal investigation and subject to possible criminal prosecution;

c. Although no specific promises of assistance were made, SFO Sullivan had assisted the Defendant on numerous occasions in the past in regard to her involvement in criminal matters, asking prosecutors and probation officers to be lenient on Defendant;

d. The Defendant had been authorized in the past to engage in criminal activity, specifically to transport drugs and be in the presence of drug activity on more than one occasion;

e. The Defendant had been specifically authorized to engage in the drug conspiracy that was the subject of the questions Defendant was subjected to by SFO Sullivan;

f. Although no specific promises of payment were made, the Defendant had received payments, for the information that she provided, of approximately $3,450 from August 1997 through January 2000, two months before the statement at issue was made.

United States v. Jacobs, 312 F. Supp. 2d 619, 631 (D. Del. 2004).

As an initial matter, I agree with the Government that

33

several of the factual findings relied upon by the District Court are clearly erroneous. First, I believe that the District Court's statement that Jacobs was summoned to the Wilmington FBI Office on March 14, 2000, is clearly erroneous. It conflicts with the District Court's own "findings of fact" section, which states that "Defendant contacted SFO Sullivan by calling his cell phone at approximately 6:00 p.m." See id. at 624.

Second, the District Court's opinion erroneously implies that Jacobs was already "the target of a criminal investigation and subject to possible criminal prosecution" at the time of her meeting with Sullivan. In fact, Jacobs was not a target of a criminal investigation until after the March 14 meeting. See id. at 625 (stating that it was not until March 29, 2000, that a second source provided information implicating Jacobs in the drug ring).

Third, I believe that the District Court's finding that "[t]he Defendant had been specifically authorized to engage in the drug conspiracy that was the subject of the questions Defendant was subjected to by SFO Sullivan" is clearly erroneous because there is no support for it in the record. Indeed, the testimony in the record is to the contrary; Jacobs had never even mentioned Bruce Stewart to her FBI handlers prior to March 14, 2000.

II.

34

That some of these factual findings were erroneous, however, does not vitiate the District Court's finding that there was an implied promise not to use Jacobs' statements against her. The District Court concluded that all the factors taken together "establish, at least by implication, that whatever the Defendant said would not be used against her," and that the implied promise "deprived [Jacobs] of the ability to make a knowing and voluntary election of whether to make a statement to the FBI Task Force."[14] Id. at 632.

The District Court's conclusion that the FBI impliedly promised Jacobs that her statements would not be used against her is a finding of fact. See United States v. Braxton, 112 F.3d 777, 783 (4th Cir. 1997) (applying clear error standard to district court's finding that officer's statement constituted an implied promise); cf. United States v. Strawser, 739 F.2d 1226, 1229

---

[14] After noting that it had considered all of the facts supporting its conclusion, the District Court stated: "Most importantly, the Defendant's ten year relationship with SFO Sullivan, during which he assisted her in resolving criminal charges and the fact that she was not aware that she was a target in the instant criminal investigation and, in fact, provided helpful information in the investigation, in the Court's view, establish, at least by implication, that whatever the Defendant said would not be used against her." Id. at 632. As discussed above, Jacobs was not a target on March 14, 2000. The District Court, however, was discussing both the March 14 statements and the April 4 statements in this passage, and I interpret this reference to refer only to the April 4 statements.

35

(7th Cir. 1984) ("In this case we hold that the district court was not clearly erroneous in its finding that the government made no express or implied promises [that induced defendant's guilty plea]."); Kingsford v. Salt Lake City School Dist., 247 F.3d 1123, 1132 (10th Cir. 2001) (holding that the existence of an implied-in-fact promise to terminate for cause is a question of fact for the jury).[15]  Although the District Court's ultimate

---

[15] I recognize that the distinction between questions of fact and mixed questions of law and fact is often elusive.  See Miller v. Fenton, 474 U.S. 104, 113 (1985) ("[T]he Court has yet to arrive at 'a rule or principle that will unerringly distinguish a factual finding from a legal conclusion.'") (citations omitted).  To be sure, there are some legal standards applicable to implied promises.  For example, in Fraction this Court noted that the existence of an implied promise is judged from the defendant's, rather than the officer's, perspective.  United States v. Fraction, 795 F.2d 12, 15 (3d Cir. 1986).  But the mere existence of relevant legal standards does not automatically transform a question of fact, which is reviewed for clear error, into a mixed question of law and fact, which is reviewed *de novo*.  Indeed, the existence a promise has long been held to be question of fact.  See Williston on Contracts § 8:5, at 102 (Richard A. Lord ed. 4th ed. 1992) ("[T]he existence and scope of promises are questions of fact, and a determination that a promise exists will not be overturned on appeal unless it is clearly erroneous.").  Moreover, as a matter of judicial allocation, trial courts are far better suited to decide whether a promise arose out of a given set of facts.  See Miller, 474 U.S. at 113-114 ("[T]he decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is analysis.").  Unlike the ultimate determination of "voluntariness," the existence of a promise is not a

36

determination of whether a statement was voluntary is a legal determination subject to plenary review, we review the factual findings underlying that determination for clear error. United States v. Walton, 10 F.3d 1024, 1027 (3d Cir. 1994); see also Miller v. Fenton, 474 U.S. 104, 115 (1985). Accordingly, absent clear error, this Court may not disregard the District Court's finding of an implied promise.

We have recently re-iterated that "[u]nder the clearly erroneous standard, 'a finding of fact may be reversed on appeal only if it is completely devoid of a credible evidentiary basis or bears no rational relationship to the supporting data.'" Shire US Inc. v. Barr Labs., Inc., 329 F.3d 348, 352 (3d Cir. 2003) (quoting American Home Prods. Corp. v. Barr Labs., Inc., 834 F.2d 368, 370-371 (3d Cir. 1987)).

The Government argues that the District Court's finding is clearly erroneous because "there is no evidence in the record to support either an objective or subjective belief by the defendant that her statements to SFO Sullivan would not be used against her." Although I agree that evidence for this conclusion is scant, I cannot agree that it is nonexistent. Certain matters are clear. Sullivan never made an express promise of immunity. Furthermore, no finding of fact indicates that Jacobs had previously admitted unauthorized criminal conduct to Sullivan,

---

legal principle that "can be given meaning only through its application to the particular circumstances of a case." Id. at 114.

or that Sullivan had failed to use any admission against her.

Even in the absence of an express promise of immunity, however, I believe that the course of dealings between Jacobs and Sullivan provides a rational basis for the District Court's conclusion that Jacobs reasonably understood there to be a promise not to use her statements against her. The District Court heard testimony regarding the ten year relationship between Sullivan and Jacobs, during which Jacobs provided substantial information to Sullivan regarding numerous criminal investigations. Jacobs had been financially compensated for this information, and Sullivan had talked to law enforcement and courts on Jacobs' behalf on several occasions when she had criminal charges pending against her. Jacobs had also been authorized to engage in drug purchases on numerous occasions, most recently from February 24, 1999, to May 27, 1999. Even when she was not specifically authorized to engage in criminal activity, she would contact Sullivan whenever she obtained information pertinent to some criminal activity. Although this evidence is not overwhelming, I cannot conclude that the circumstances detailed above do not rationally support the District Court's finding of an implied promise.

III.

Having determined that the District Court's finding of an implied promise was not clearly erroneous, the next question is whether, accepting this finding as correct, the District Court

38

erred in determining that the statements were involuntary.

Over a century ago, the Supreme Court held that statements are involuntary when "obtained by any direct or implied promises, however slight." Bram v. U.S., 168 U.S. 532 (1897). The existence of a promise, however, "does not automatically render inadmissible any statement obtained as a result of that promise." Walton, 10 F.3d at 1028. Rather, a promise, either express or implied, is a factor in the totality of the circumstances inquiry of whether a statement is voluntary. See id. at 1028; see also Miller v. Fenton, 796 F.2d 598, 608 (3d Cir. 1986) ("[P]romises do not trigger an analysis different from the totality of the circumstances test."). Nonetheless, a promise may often be "the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances." Walton, 10 F.3d at 1030.

Here, the totality of the circumstances supports the District Court's determination that Jacobs' statements were involuntary. Although, as the majority points out, Jacobs initiated the March 14, 2000 meeting and selected the location, I do not believe that these circumstances render the statement voluntary. See United States v. Conley, 859 F. Supp. 830, 837 (W.D. Pa. 1994) (holding that although the typical indicators of coercion were not present, agent's promise to speak off the record and his friendly manner "combined to overcome Conley's reticence about making statements to the FBI"). The involuntariness here stemmed from Jacobs' belief that she could

bring information to Sullivan and that he would not later use the information against her. Had there been no such perceived understanding, Jacobs would not have subjected herself to criminal liability by delivering potentially incriminating information to Sullivan. The March 14 statements were therefore the direct product of the implied promise, and cannot be considered voluntary. Accordingly, I believe that the totality of the circumstances supports the District Court's conclusion that the March 14 statements were involuntary.

## IV.

Although I admit that this is a close case, I would affirm the District Court. The existence of an implied promise is a finding of fact, and it cannot be said that the District Court committed clear error in determining that the surrounding circumstances gave rise to an implied promise. Having accepted the District Court's finding that there was an implied promise, I agree with its conclusion that the March 14 statements were involuntary and should be suppressed. I respectfully dissent.