NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

—————————

No. 19-1785

—————————

UNITED STATES OF AMERICA

v.

WILMER CHAVEZ ROMERO,
a/k/a Charmin,
Appellant

—————————

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 2-16-cr-00495-001)
District Judge: Honorable William H. Walls

—————————

Submitted Under Third Circuit L.A.R. 34.1(a)
May 27, 2020

Before: AMBRO, HARDIMAN, and RESTREPO, <u>Circuit Judges</u>

(Opinion filed: July 9, 2020)

—————————

OPINION[*]

—————————

AMBRO, <u>Circuit Judge</u>

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Wilmer Chavez Romero was a manager and "strong arm" for an extensive prostitution business that employed undocumented women. A jury convicted him on eight counts of federal crimes, and the District Court sentenced him to life plus 240-months' imprisonment. He appeals to us, claiming that the Court should not have denied his motion to suppress his statements to law enforcement and there was insufficient evidence for one count of conviction: conspiracy to harbor aliens. As both claims fail, we affirm his convictions.

## I. Background

### A. Factual background

Chavez Romero was indicted for his participation in the operation of a network of brothels in New Jersey. At trial it was shown that the brothels employed undocumented women, who were paid in cash, forced to rotate among various houses, and banned from leaving these houses without permission. Chavez Romero worked for Juan Freddy Hernandez-Zozaya and Elizabeth Rojas, who operated the network. His duties included managing houses in Bridgeton and Lakewood, advertising them by handing out business cards, and ensuring, often through violence, that other brothels in the areas did not encroach on his group's business.

Chavez Romero began working for Hernandez-Zozaya and Rojas because of his immigration status. Born in Nicaragua, he came to the United States in 1992 at the age of three. He maintained permanent resident status until 2011, when he found he could only afford to apply for citizenship or renew his green card. He chose to apply for citizenship, but his application was ultimately unsuccessful due to his arrest in 2012. After stumbling

2

upon an employment opportunity found on Facebook, Chavez Romero started work at the Lakewood brothel. Eventually, he moved to the Bridgeton location. During this time, he was involved in at least two robberies of competing brothels that resulted in the murders of two caretakers.

B. Procedural background

On November 30, 2012, New Jersey State Police officers searched the Bridgeton brothel, which Chavez Romero managed at that time. They found a firearm on the property and detained Chavez Romero. Waiving his *Miranda* rights, he agreed to cooperate with local authorities and gave a recorded statement to Detective Frank Sabella. The District Court quoted Sabella as stating the following at the end of the interview:

> I think you have a lot to offer and, in turn, opportunities will be given to you . . . but like I said, I make no promises, I can't. I am not in that position, I am not the U.S. Attorney. I am not the prosecutor, I am not the Federales, you know? But people talk to me. And I one hundred percent appreciate the situation you are in and your immigration status put you in.

J.A. 45.

Chavez Romero claims that he decided to cooperate "because of the psychological pressures he felt due to his immigration status and deportation fears, and the suggestions by law enforcement that talking would help him." Romero Br. at 8. He testified at trial that the promise of law enforcement's help with his immigration status led to his deeper involvement in Hernandez-Zozaya and Rojas's prostitution network.

In 2014 Chavez Romero was arrested for a court violation related to his state-gun-possession charge. While in custody he agreed to give a second interview to federal law

3

enforcement authorities, this time accompanied by counsel. He admitted to working for Hernandez-Zozaya, robbing a competitor's brothel, striking its caretaker, Nehemias Reyes Gonzales, with a nightstick, and "maybe" killing him during a later robbery. He also confessed to participating in other violent crimes, including the murder of Benito Escalante.

The Government brought federal charges against Chavez Romero, after which he participated in at least three proffer meetings with the U.S. Attorney's Office. The Superseding Indictment charged him with eight counts of federal violations for racketeering, racketeering conspiracy, assault with a dangerous weapon in aid of racketeering, murder in aid of racketeering (two counts), discharging a firearm during a crime of violence (two counts), and conspiracy to commit alien harboring.

In February 2018 Chavez Romero moved to suppress statements from his November 30, 2012 and August 12, 2014 interviews, claiming that they were "made under duress and in an extreme heightened emotional state due to [his] belief he would be deported and separated from his family," and thus involuntary. Romero Br. 10. The District Court denied the motion after holding oral argument.

During an eleven-day jury trial, the Government presented testimony from the detectives and special agents who conducted Chavez Romero's 2012 and 2014 interviews, as well as investigators of the prostitution ring, and witnesses to and investigators of the murders of Reyes Gonzales and Escalante. Chavez Romero testified that he lied in his 2012 and 2014 interviews—stating that he had participated in crimes that he had only heard of and exaggerating his relationship with Hernandez-Zozaya—in

4

order to offer information that would reduce his sentence.  He also moved twice for a judgment of acquittal based on sufficiency of the evidence.

The jury convicted Chavez Romero on all counts.  The District Court imposed a total sentence of life plus 240-months' imprisonment.  He appeals to us.

## II.    Discussion

A. Chavez Romero's statements to law enforcement do not meet our standard for involuntary statements; thus the District Court correctly denied his motion to suppress.

Chavez Romero argues that the District Court erroneously denied his motion to suppress, in which he sought to preclude the introduction of his recorded interviews with law enforcement in November 2012 and August 2014.  He repeats that these statements were involuntary because of the psychological pressure he felt from his immigration status and his fears of deportation and separation from his family.

When reviewing a motion to suppress, we exercise plenary review of whether a statement was voluntary, and we review the factual findings underlying that determination for clear error.  *United States v. Walton*, 10 F.3d 1024, 1027 (3d Cir. 1993).  Involuntary statements made to law enforcement are inadmissible evidence. *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005).  We look at the totality of the circumstances; "[i]f an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary." *Id.*  As a threshold matter, we must determine that there was coercive police activity and "some causal connection between the police conduct and the confession." *Id.*

5

Chavez Romero asserts that he was nervous about his residency status prior to his arrest on November 30, 2012, thus "[h]earing police tell him that maybe if he cooperated, they could get him some help with his immigration problem was enough to overpower his free will."  Romero Br. 14.  According to the interview transcript, Chavez Romero initially brought up his expired residency status, and it was not until the end of the interview that Agent Sabella made any suggestion that the authorities could help with his status in exchange for his cooperation.  Further, Sabella explicitly noted that he could not make any promises.  Even if we were somehow to determine that Sabella's statement regarding Chavez Romero's immigration status was coercive, the timing does not support the conclusion that it caused his cooperation.[1]  As the Supreme Court noted, even "more subtle forms of psychological persuasion . . . do[ ] not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

Chavez Romero also argues that his statements to federal authorities in August 2014 were coerced because his desperation to avoid deportation continued to motivate his decision to cooperate with the authorities.  He did not make this argument in the District Court.  Instead, he argued there that his 2014 statements were a product of ineffective assistance of counsel.  Thus he has forfeited the claim that these statements were coerced.

---

[1] Before the District Court, Chavez Romero argued that Agent Sabella made unrecorded comments before his interview began that rendered his statements involuntary.  The District Court found Chavez Romero's contention speculative, and he does not repeat this argument before us.

*See United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013) ("[T]o preserve an argument . . . , the argument presented in the Court of Appeals must depend on both the same legal rule and the same facts as the argument presented in the [d]istrict [c]ourt."). We affirm the District Court's denial of Chavez Romero's motion to suppress.

B. Given the evidence presented at trial, a rational jury could have found that Chavez Romero conspired to harbor aliens.

Next, Chavez Romero argues that there was insufficient evidence for the jury to find that he conspired to harbor aliens. We exercise fresh review over the District Court's denial of Chavez Romero's Rule 29 motion for judgment of acquittal. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006). "We review 'the evidence in the light most favorable to the Government,' afford 'deference to a jury's findings,' and draw 'all reasonable inferences in favor of the jury verdict.'" *United States v. Moyer*, 674 F.3d 192, 206 (3d Cir. 2012) (quoting *United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010)). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (citation omitted).

A conviction for conspiracy to harbor illegal aliens under 8 U.S.C. § 1324(a)(1)(A)(v)(I) requires proof that Chavez Romero

> [a]greed with one or more persons to transport or move illegal aliens within the United States in furtherance of their unlawful presence, or to conceal, harbor, or shield from detection such aliens, knowingly or in reckless disregard of the fact that such aliens had come to, entered, or remained in the United States in violation of law.

*United States v. Chon*, 713 F.3d 812, 818 (5th Cir. 2013). Further, our standard for shielding undocumented individuals from detection requires proof that he undertook

7

"affirmative conduct" that "tend[s] substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence." *United States v. Cuevas-Reyes*, 572 F.3d 119, 122 (3d Cir. 2009) (citation omitted).

The Government introduced enough evidence for the jury to conclude that Chavez Romero conspired to harbor aliens. For example, he admitted that he knew most of the women were undocumented, **J.A. 451–52**, and were paid in cash without filling out the requisite Government tax and employment paperwork. In addition, his role managing brothels in Lakewood and Bridgeton made him privy to how Hernandez-Zozaya and Rojas managed their female workers, which included leasing the houses for brothels in fake names, transporting the women between locations each week, and not allowing them to leave the house without permission. The jury could infer that Chavez Romero conspired with his bosses to "minimize[ ] the illegal employees' exposure to the general public" by running errands for them so that they would not risk detection by the authorities, managing the houses where they lived, and putting the lease for the Bridgeton brothel in his name. *United States v. McClellan*, 794 F.3d 743, 751 (7th Cir. 2015).

This case is ultimately reminiscent of *United States v. Chon,* which held renting rooms and providing food for undocumented individuals was strong circumstantial evidence that the defendant "was aware of the scope and objectives of the conspiracy" despite "no direct evidence" of his agreement with the co-conspirator. 713 F.3d at 819. Viewing the evidence in the light most favorable to the prosecution, the jury's guilty

8

verdict was not "so insupportable as to fall below the threshold of bare rationality." *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

\* \* \* \* \*

As Chavez Romero's arguments are unpersuasive, we affirm.